UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTIAN KLEINJANS,

    Plaintiff,

v.

M. SCOTT KORPAK, et al.,

    Defendants.

_____/

Case No. 1:24-cv-643

Hon. Hala Y. Jarbou

## OPINION

Christian Kleinjans brings this § 1983 action against M. Scott Korpak, Matthew Shane, and Erin Moore claiming First Amendment retaliation. Kleinjans alleges that Defendants terminated his employment with Michigan State University Extension ("MSU Extension") in Ottawa County in retaliation for his political activity and speech.

Before the Court is Kleinjans's motion to preliminarily enjoin his termination (ECF No. 7). He initially sought a temporary restraining order, which this Court denied (ECF No. 11). All defendants have now responded, and the Court held an evidentiary hearing on July 9, 2024. Jurisdiction is proper under 28 U.S.C. § 1331 as this matter presents a federal question.

Note, any analysis is applicable only to the instant motion; no finding or conclusion is binding on the Court or the parties in the future.

### I. BACKGROUND

**A. Kleinjans and MSU Extension**

MSU Extension is an affiliate of Michigan State University that partners with counties throughout Michigan to provide community-based education and government programs. (Compl. ¶ 11, ECF No. 1.) MSU Extension in Ottawa County is funded through a variety of governmental

programs and partnerships. (*Id.* ¶¶ 11-13.) It receives some funding from Ottawa County through an annual memorandum of understanding ("MOU"), but also receives funding from federal and state sources, depending on the program. For instance, Kleinjans worked as a nutritional instructor as part of MSU Extension's partnership with the Michigan Department of Health and Human Services. This partnership's purpose is to administer the U.S. Department of Agriculture's Supplemental Nutrition Assistance Program Education ("SNAP-Ed"). Kleinjans's position was funded by the federal government. (*Id.* ¶ 12.)

Defendants all work for MSU Extension. Erin Moore is the Associate Director of the MSU Extension Health and Nutrition Institute and was Kleinjans's supervisor prior to his termination. (Moore Aff. ¶¶ 2-3, ECF No. 15-3.) M. Scott Korpak is the Director of the MSU Extension offices located in Allegan, Barry, Kent, and Ottawa Counties. (Korpak Aff. ¶ 2, ECF No. 15-2.) Matthew Shane is the Associate Director for all Field Operations of MSU Extension. (Shane Aff. ¶ 2, ECF No. 15-1.)

### B. Ottawa County Commissioners and Ottawa Impact

In November 2022, a political group called Ottawa Impact ("OI") ran several candidates for the Ottawa County Commission (the "Commission"). (Compl. ¶ 16.) Kleinjans describes OI as a "far-right Political Action Committee." (*Id.*) The OI-backed candidates won a majority of seats on the Commission and succeeded in electing one of their members, Joe Moss, as the Commission's Chairperson. (*Id.* ¶ 19.) The OI-affiliated commissioners also included Allison Miedema and Lucy Ebel. (*Id.* ¶¶ 17, 20.)

The newly seated Commission moved in early 2023 to remove the County's Public Health Officer and install a political ally. (*Id.* ¶ 20.) This, among other controversial actions, spurred a political backlash against the OI majority. (*Id.* ¶ 21.) As part of that backlash, a group of Ottawa County voters initiated an effort to recall Ebel. (*Id.*) The effort gathered signatures in support of

2

a recall throughout the summer and fall of 2023. The recall effort was certified on November 27, 2023 and set to be placed on the ballot in a May 2024 election. (*Id.* ¶ 25.)

### C. Kleinjans's Political Activity and Pressure from Ottawa Impact

Kleinjans was involved in the early stages of the Ebel recall effort and was selected by the Ottawa County Democratic Party as its candidate to run in the recall election. (*Id.* ¶ 24.) The party did not publicly announce this decision until after the recall was certified. (*Id.* ¶ 26.)

Unhappy with the recall effort and Kleinjans's candidacy and public comments, OI began to exert pressure on MSU Extension to terminate or relocate Kleinjans. Their primary tactic was to threaten the approval of the MOU. (*Id.* ¶¶ 27, 29.) Normally, the Commission approved the MOU automatically; but in the wake of the Ebel recall effort, the Commission removed the MOU from the "consent agenda" and delayed its consideration for months. (*Id.* ¶¶ 27, 33, 37.) In a meeting between Moore and Kleinjans (that Kleinjans recorded), Moore expressed her concern with the vindictive "tit for tat" moves of the Commission. (11/27/2023 Meeting Recording, Prelim. Inj. Mot. Hrg., Pl.'s Ex. 1.[1]) She acknowledged that the failure to approve the MOU could potentially cost MSU Extension both office space and jobs in Ottawa County. (*Id.*) She also acknowledged that even if the MOU were to be approved, the Commission could withdraw support at any point in the future. (*Id.*)

Unbeknownst to Kleinjans at the time, Shane and Korpak corresponded with the Commission about its request to terminate or relocate Kleinjans. (Korpak Aff. ¶¶ 10-11.) In January 2024, Shane and Korpak refused to acquiesce to the Commission's request, citing

---

[1] The recording of the November 27, 2023 meeting was admitted at the July 9, 2024 preliminary injunction hearing. Also admitted were recordings of the December 14, 2023 meeting and the May 23, 2024 meeting.

3

Kleinjans's First Amendment rights to political speech and activity. (1/5/2024 Shane Email, ECF No. 15-6.) Shortly thereafter, the Commission approved the MOU. (Korpak Aff. ¶ 12.)

### D. Kleinjans Discusses His Political Activity with Defendants

Kleinjans met with Defendants regarding his political activities several times throughout 2023 and 2024. On November 27, 2023, Kleinjans met with Moore to notify her of his intention to run for County Commissioner and to discuss some of the backlash from OI. (Moore Aff. ¶ 4.) Moore shared her concerns about OI's vindictive nature and strategized with Kleinjans about how to move forward to protect both him and MSU Extension. She emphasized that this meeting was just one of several that would need to take place in the future. (11/27/2023 Meeting Recording.)

On December 5, 2023, Kleinjans met with all three Defendants to discuss further issues surrounding his political activities (Kleinjans did not record this meeting). (*See, e.g.*, Moore Aff. ¶ 6 (Shane and Korpak testified to the same at the preliminary injunction hearing).) The specific contents of the December 5, 2023 meeting are disputed. Korpak and Shane both testified that they informed Kleinjans that his campaign activity presented separate concerns from holding political office. According to Defendants, they communicated to him that while he was free to campaign for office, his employment would need to be re-evaluated should he win office. Kleinjans, however, testified that he was not told that he would be fired should he win office and that he cannot recall if potential conflicts of interest were discussed.

On December 14, 2023, Kleinjans again met with all three Defendants where they relayed concerns from the County Commissioners about his political activity and counseled him on how he could campaign without violating MSU Extension employment policies (Kleinjans also recorded this meeting). (12/14/2023 Meeting Recording, Prelim. Inj. Mot. Hrg., Pl.'s Ex. 2.) Defendants assured Kleinjans that his political campaign was not in violation of any MSU

4

Extension policies and that he would not be terminated or relocated for such activity. (*Id.*) He did not meet with Defendants again until May 23, 2024. (Shane Aff. ¶¶ 15-16.)

### E. Kleinjans's Termination

On May 7, 2024, Kleinjans won his bid to replace Ebel as County Commissioner. (Shane Aff. ¶ 14.) His term began May 28, 2024, and runs through the end of the year. (*Id.* ¶¶ 14, 17.) Meanwhile, Kleinjans continues to run for the full-term seat. (Kleinjans Aff. ¶ 3, ECF No. 8-2.) That election will take place on November 5, 2024.

Following his runoff election in May, Kleinjans met with Defendants once again on May 23, 2024. (Shane Aff. ¶ 15.) During this meeting (which Kleinjans also recorded), Defendants communicated to Kleinjans that they could not see a path forward for his continued employment with MSU Extension. (*Id.* ¶ 16.) Defendants cited three reasons: Michigan's Incompatible Offices Act, Mich. Comp. Laws § 15.181 et seq., MSU Extension's conflict of interest policies, and the practical considerations of holding both the nutritional instructor position and the part time County Commissioner office. (*Id.*)

Defendants offered Kleinjans the ability to go on unpaid leave until the November election. Should he ultimately be elected, Kleinjans would then be terminated. If he were to lose, Kleinjans could then come off of unpaid leave and restart his work as a nutritional instructor. Kleinjans refused on June 4, 2024 to go on unpaid leave and was terminated. (*Id.* ¶ 17.)

## II. LEGAL STANDARD

Whether to issue a preliminary injunction is in the discretion of the district court. *Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015). A court considers and balances four factors: (1) whether the movant has established a substantial likelihood or probability of success on the merits; (2) whether the movant would suffer irreparable injury without the preliminary injunction; (3) whether the issuance of the preliminary injunction would cause substantial harm to

others; and (4) whether the public interest would be served by issuance of the preliminary injunction. *Kentucky v. Hagel*, 759 F.3d 588, 600 (6th Cir. 2014). Each factor should "be balanced against one another[.]" *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014).

A "preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (internal quotation marks and citation omitted). An injunction at this stage should "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted).

### III. ANALYSIS

Ordinarily, the Court would analyze all four preliminary injunction factors. However, "[i]n constitutional cases, the first factor is typically dispositive." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021). Because Kleinjans complains of a First Amendment injury, factors two through four presumably favor him. *See Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Vitolo*, 999 F.3d at 360 ("No cognizable harm results from stopping unconstitutional conduct, so 'It is always in the public interest to prevent violation of a party's constitutional rights.'") (quoting *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001)). Thus, preliminary relief will rise or fall on factor one alone—whether Kleinjans can show a substantial likelihood of success on the merits.

The merits of this case are also simplified. A First Amendment retaliation claim has three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that

6

conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999). Here, Kleinjans can easily meet elements one and two. "Core political speech is the most jealously guarded form of expression under the First Amendment[,]" *Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021) (internal quotations omitted), and "a termination from employment is the quintessential example of an adverse employment action[.]" *Ehrlich v. Kovack*, 710 F. App'x 646, 649 (6th Cir. 2017). That leaves only element three.

The Court thus has one and only one question—whether Kleinjans has shown a substantial likelihood of success of establishing a causal connection between his political activity and his termination. The Court concludes he falls shy of that burden.

It is undisputed that the OI majority sought political retribution against Kleinjans. His comments about OI, his early involvement in the Ebel recall effort, and his campaign all led the OI-affiliated commissioners to exert pressure on MSU Extension to terminate or relocate Kleinjans. Had OI been successful, Kleinjans would likely have a clear-cut case for First Amendment retaliation. He would certainly have shown a sufficient likelihood of success on the merits to obtain a preliminary injunction. But OI was not successful—Defendants rebuffed OI's retaliatory effort. In other words, Defendants protected Kleinjans's First Amendment rights in the face of pressure from OI. And Kleinjans does not show what, if anything, changed for Defendants between January and May.

Kleinjans argues that Defendants' retaliatory motive is established by inference. The inference goes something like this. As long as Kleinjans was employed by MSU Extension and actively opposing OI, OI would be a thorn in MSU Extension's side, and its funding would always be precarious. The easiest solution, then, would be to get rid of Kleinjans. But Defendants could

7

not terminate Kleinjans immediately—the First Amendment protections during Kleinjans's campaign were too clearcut to provide cover for his termination.  But his election provided Defendants with an opportunity.  When Kleinjans won his election, Defendants could now point to violations of MSU Extension policies, the Incompatible Offices Act, and practical considerations such as incompatible working hours to justify his termination.  But these justifications were merely pretext, according to Kleinjans.  This pretext can be inferred by Defendants' incorrect reading of the Incompatible Offices Act, and the fact that any conflict of interest could have been cured by Kleinjans abstaining from a vote on future MOUs.  Indeed, Moore told Kleinjans as much in the November 27, 2024 meeting, and no Defendant ever told him that he could not hold both offices.  Further, Moore's comment about abstaining from future votes on the MOU implied that Defendants assumed he could in fact hold office and still remain employed.  Thus, to Kleinjans, Defendants perhaps thought he would not win and figured the OI headache would go away.  When he did win, Defendants decided it would be simpler to terminate Kleinjans and cite some flimsy justifications to avoid First Amendment complications.

Simply put, that argument requires a lot of supposition.  While Kleinjans's inferences are certainly plausible, he offers little in the way of evidence to support them.  Some evidence is consistent with his theory: OI's attempt to exact retribution against Kleinjans, Moore's fear of future OI threats, and Moore's discussion with Kleinjans about abstaining from MSU Extension-related votes should he win office.  In a vacuum, perhaps this would be sufficient to show a likelihood of success on the merits.  But Defendants proffer significant evidence of their own that belies Kleinjans's inferences.

First, the fact that Defendants previously rebuffed OI's attempt to retaliate against Kleinjans is significant.  Arguably, if Defendants were so threatened by OI's refusal to approve

the MOU, Defendants would have been best served by finding a reason to get rid of Kleinjans sooner rather than later. The motivation to terminate Kleinjans was strongest when there was a credible, present threat, but Defendants effectively neutralized it. And Defendants ceded no ground in doing so—they communicated to OI that they would not terminate Kleinjans, and OI backed down. While Kleinjans adduced evidence to show that, at least in November 2023, Defendants feared a potential ongoing threat, he adduced no evidence showing that Defendants' ability or desire to rebuff that threat ever weakened. To the contrary, Korpak testified that there was no such ongoing threat—no commissioners contacted Defendants regarding Kleinjans after their initial attempt to remove him.

Second, Korpak and Shane both testified that they told Kleinjans in the December 5, 2024 meeting that they would need to revisit discussions about his employment should he ultimately win office. Kleinjans seems to dispute this. Unlike the other meetings, the Court has no recording of the December 5 meeting to easily resolve the dispute. But Korpak and Shane were both credible on the stand, and other evidence substantiates their version to some degree. In the November 27, 2024 meeting, Moore told Kleinjans that while his campaign activity was likely fine, this meeting was just one of multiple conversations that would need to take place. This caveat weakens Kleinjans's insistence that he was never told that he would be fired, or that Defendants insinuated that he could serve in both roles—this was one meeting, and the earliest one at that.

Further, in the May 23, 2024 meeting, Shane referenced conversations "in the fall" about needing to have future discussions about Kleinjans potentially serving in both roles, despite okaying his campaign. (5/23/2024 Meeting Recording, Prelim. Inj. Mot. Hrg., Pl.'s Ex. 3.) While this statement could have been a remarkably shrewd move by Shane to cover his bases in anticipation of future litigation, the tone and tenor of the conversation suggests otherwise. The

Court finds that Kleinjans was informed that the employment implications for running a campaign differed from those for holding office. This weakens inferences of both causation and pretext.

Third, Defendants testified that they were told by MSU Extension's legal counsel that Kleinjans's employment and Commission office would violate Michigan's Incompatible Offices Act. Kleinjans argues that Defendants' reading of the law is incorrect. But an incorrect reading of the law does not necessarily establish pretext. *See Connick v. Myers*, 461 U.S. 138, 146 (1983) ("[O]rdinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable."). To show pretext, Defendants' reading of the law would need to be so wrong as to indicate some element of bad faith at play. But Defendants can point to case law that supports their interpretation. For instance, Defendants cite *Wayne County Prosecutor v. Kinney*, 458 N.W.2d 674 (Mich. Ct. App. 1990). In *Kinney*, the court held that the defendant's roles as both a city firefighter and a city council member violated the Incompatible Offices Act because the city council approved the city fire department's contract. *Id.* at 684. The court specifically held that even "if defendant abstains from voting on the contract, he still would be in violation of the act, since the incompatibility of his offices can be said to have resulted in the breach of his official duties as a city council member." *Id.* This supports Defendants' contention that a breach of the Incompatible Offices Act could not have been cured by abstaining from certain votes. The abstention itself is the breach.

One can quibble with the cases Defendants cite—for instance, unlike the defendant in *Kinney*, Kleinjans's specific position is not funded by the MOU between Ottawa County and MSU Extension—but Defendants' interpretation is certainly not so egregiously wrong as to indicate pretext. At best, Kleinjans has showed a likelihood of winning on his interpretation of the

10

Incompatible Offices Act, but that is not directly at issue in this case. The issue is whether Defendants based their employment decision on something other than Kleinjans's protected conduct. Defendants can point to reliance on a reasonable interpretation of the Incompatible Offices Act, and Kleinjans has not demonstrated a likelihood of success of showing that reliance to be pretextual.

Defendants can also point to MSU Extension policies, such as conflicts of interest and outside work for pay, to justify their termination of Kleinjans. Again, while Kleinjans questions Defendants' interpretation of those policies, the Court is not persuaded that their interpretation is so obviously unreasonable as to indicate pretext. Defendants appear to have been concerned with multiple overlapping complications stemming from Kleinjans's dual role. Indeed, in the May 23, 2024 meeting, Shane communicated that Defendants attempted to find a path forward for Kelinjans's continued employment but came up short. Shane's comments rang as genuine, and his disappointment sounded sincere.

## IV. CONCLUSION

At this point, Kleinjans's case relies on inferences. Defendants can counter those inferences with evidence. Some of that evidence is record evidence like emails and recordings, and some is testimonial. While Kleinjans was a credible witness on the stand, so were Korpak and Shane. But only Korpak and Shane can testify as to their motivations for terminating Kleinjans. Kleinjans did not successfully impeach Korpak or Shane and provides insufficient record evidence to support his theory of the case. At bottom, he has not met his burden to clearly show a likelihood

of success on the merits.  The Court will not provide the extraordinary relief of a preliminary injunction.

An order will enter consistent with this Opinion.


Dated: August 15, 2024                    /s/ Hala Y. Jarbou
                                          HALA Y. JARBOU
                                          CHIEF UNITED STATES DISTRICT JUDGE