## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHGIAN
## SOUTHERN DIVISION

———————————————————

**CHRISTIAN KLEINJANS,**

       Plaintiff,

v.

**M. SCOTT KORPAK**,
**MATTHEW SHANE**,
**ERIN MOORE**, and **JOE MOSS**,
in their official and personal capacities,

       Defendants.

Case No. 1:24-CV-643

Hon. Hala Y. Jarbou

———————————————————————————————————

## FIRST AMENDED COMPLAINT AND JURY DEMAND

———————————————————————————————————

For his First Amended Complaint filed pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiff Christian ("Chris") Kleinjans, by and through his attorneys, Pinsky Smith, PC, states as follows:

### JURISDICTION, VENUE, AND PARTIES

1.    This is an action seeking declaratory and injunctive relief, as well as damages, for violation of Plaintiff's rights to free speech and association under the First Amendment of the U.S. Constitution, pursuant to 42 U.S.C. § 1983.

2.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

3.    Plaintiff Chris Kleinjans is a resident of Ottawa County, in the Western

District of Michigan. Plaintiff is also an elected Ottawa County Commissioner, after he won a recall election to unseat another commissioner on May 7, 2024, and was sworn into office on May 16, 2024. Until June 4, 2024, Michigan State University Extension (MSU Extension) employed Plaintiff full time as a Community Nutrition Instructor in Ottawa County. Ottawa County is part of MSU Extension District 7. At the time of Defendants' termination of Plaintiff from his employment with MSU Extension, Plaintiff had been employed there for more than a decade.

4.     Defendant M. Scott Korpak is the director of MSU Extension District 7. Upon information and belief, Defendant Korpak is a resident of Kent County, within the Western District of Michigan. MSU Extension has operations all over the State of Michigan, but its headquarters are located in Ingham County, within the Western District of Michigan.

5.     Defendant Matthew Shane is the Associate Director of MSU Extension, responsible for field operations. Upon information and belief, Defendant Shane is a resident of Lenawee County, within the Eastern District of Michigan.

6.     Defendant Erin Moore is the associate director of the MSU Extension Health & Nutrition Institute. Defendant Moore is a resident of Kent County, within the Western District of Michigan.

7.     Defendant Joe Moss is the Chairperson of the Ottawa County Commission. Defendant Moss is a resident of Ottawa County, within the Western District of Michigan.

8.     The acts that are the subject of this action occurred in Ottawa County.

9.    Venue is proper within this judicial district under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

10.    Ottawa County (also referred to as "the County") is a local unit of government organized pursuant to the state of Michigan. It is the seventh largest county within Michigan, and it is located in the Western District of Michigan.

11.    Ottawa County Board of Commissioners ("the Commission") is the governing county commission for Ottawa County, organized under state law.

### *MSU Extension in Ottawa County*

12.    MSU Extension is an arm of Michigan State University that partners with counties throughout the state to provide community-based education. As part of its educational mission, MSU Extension also partners with the Michigan Department of Health and Human Services (MDHHS) to administer the Supplemental Nutrition Assistance Program Education (SNAP-Ed), a nutrition education and physical activity promotion program funded by the United States Department of Agriculture (USDA).

13.    Prior to his termination, Plaintiff worked as a nutrition educator with SNAP-Ed at MSU Extension in Ottawa County. Plaintiff's position was funded by USDA through the SNAP-Ed funds provided to MDHHS.

14.    MSU Extension also receives funding from the County as part of its partnership with the County. Funding is provided by contracts between the County and MSU Extension, which must be approved by the Commission. Before 2023, those contracts were approved by the Commission without controversy.

3

15.    As part of the contract, the County provides office space to MSU Extension in the main County administration building in a campus known as Fillmore Complex in West Olive, Michigan, located in the geographic center of the County.

16.    On November 7, 2023, the County's Finance and Administration subcommittee unanimously approved a routine renewal contract to provide funding for MSU Extension in Ottawa County through the following fiscal year. The contract called for the County to provide office space, utilities, and clerical support, as well as funding for a 4-H programming coordinator.

17.    The contract was scheduled to be approved by the Commission as part of its consent agenda on November 21, 2023. Before that meeting occurred, however, the Commission removed the contract from the consent agenda to attempt to exert control over MSU Extension and force it to punish Plaintiff for his political activities. Upon information and belief, Defendant Moss made the decision to remove the contract from the consent agenda.

*The OI Majority*

18.    Defendant Moss is the Chairperson of the Ottawa County Commission. Defendant Moss was elected to the Commission in November 2022, and he was sworn into office on January 3, 2023. Defendant Moss founded Ottawa Impact ("OI"), a far-right Political Action Committee that he continues to lead, which ran a slate of candidates in the Ottawa County Commission seats in the Republican primary in August 2022. The OI slate of candidates won a majority of the Commission seats in

4

the August 2022 Republican primary, thereby ensuring control of a majority of the Commission in the general election in November 2022, since many of the Commission races did not have Democratic opponents.

19.    Allison Miedema is another Ottawa County Commissioner. Miedema was elected to the Commission in November 2022 under the OI label, and she was also sworn into office on January 3, 2023.

20.    At present, OI has a voting bloc majority ("the OI Majority") of 6 to 5 commissioners. Two commissioners who originally were OI-endorsed have left OI, but they still occasionally vote with the OI Majority.

21.    At its first meeting of the 2023-24 session, the Commission voted to elect Defendant Moss to serve as Chairperson of the Commission, although the then-new OI Majority had already publicly announced that Defendant Moss would be the Chairperson prior to the vote at that meeting.

22.    Immediately upon taking office, the new OI Majority took a number of controversial actions. Just after being sworn in, the OI Majority on the Commission voted to demote the Public Health Officer, Adeline Hambley, to interim health officer, in anticipation of firing her and appointing their political ally instead. Hambley filed suit challenging her illegal termination, and the Michigan Court of Appeals ultimately ruled that the termination was unlawful and that Hambley remained the County's Public Health Officer.

23.    The Commission's attempt to illegally terminate Hambley was one of several actions which led to a backlash against the OI Majority. In July 2023, a group

of Ottawa County voters in Ottawa County District 2 began the process to recall Lucy Ebel, a member of the OI Majority and the District 2 Commissioner, based in part on her vote to change the prior Commission's resolution that led to Hambley's appointment as health officer, as a means to try to oust Hambley. The group gathered signatures in support of a recall of Ebel during the next several months.

24.    In September 2023, as part of the battle with Hambley, the Commission voted to slash the Public Health budget. Among the funds cut from the Public Health budget were those for the County coordinator for Ottawa Food, a partnership of local public and private entities that aims to provide access to healthy and affordable food. As a result of the County's decision to cut this funding, Ottawa Food decided to suspend its operations.

25.    On November 14, 2023, Ottawa Food issued a press release announcing its decision to suspend operations. The press release cited the budget cuts as the basis for its decision. Plaintiff was a member of the Ottawa Food Advisory Board, which voted on the decision to suspend operations, and his name was listed as the media contact on the press release.

26.    That same day, the group collecting signatures on the petition to recall Ebel announced that it had gathered the required number of signatures to put the recall on the May ballot. Just prior to that announcement, the Ottawa County Democratic Party selected Plaintiff to run against Ebel in the recall election if it was confirmed for the May 2024 ballot. There was no public announcement of this decision because the recall election had not yet been confirmed. Plaintiff's supervisors at MSU

6

Extension had known of his intention to seek to run as the Democratic opponent in the recall election if it was certified for the ballot since he first told Defendant Moore in the summer of 2023, who was then his District Director and immediate supervisor.

27.    On November 27, 2023, the Ottawa County Clerk certified that there were sufficient signatures to place the recall of Ebel on the May ballot.

28.    On December 6, 2023, Plaintiff announced publicly that he would be running against Ebel in the May election as a Democrat. He resigned from the Ottawa Food Advisory Board that same day.

### *Defendant Moss's effort to punish Plaintiff through his MSU Extension employment*

29.    On November 17, 2023—just three days after the announcements about Ottawa Food and the petition signatures—County Administrator John Gibbs told James Kelly, then the interim district director for MSU Extension in Ottawa County, that the contract with the Extension would not be on the Commission's consent agenda for the next meeting, scheduled for November 21, 2023. The contract had previously passed through the Finance and Administration subcommittee unanimously. In previous years, the contract had been fully approved by the Commission no later than October.

30.    Kelly and Defendant Korpak, who was starting his new position as the district director for MSU Extension in Ottawa County, attended the November 21 Ottawa County Commission meeting. After the public meeting concluded, Defendant Moss spoke to Defendant Korpak in a private conversation in or around the Commission meeting room. Defendant Moss told Defendant Korpak that he was

7

unhappy that Plaintiff, an MSU Extension employee, had been involved in the efforts to get the recall certified against Ebel.

31.    Defendant Korpak believed that Defendant Moss's statements to him in this private conversation just after the public Board meeting were Moss's attempt to pressure MSU Extension to take adverse action against Plaintiff because of Plaintiff's political activities.

32.    At the Commission meeting, Kelly spoke in public comment and stated that he and Defendant Korpak had a meeting scheduled with "commissioners" for December 7, 2023, although he did not provide further detail about which commissioners would be present, the specific purpose of that meeting, or under what circumstances that meeting would take place.

33.    On November 27, 2023, Plaintiff met with Defendant Moore. Moore raised the issue of Plaintiff's candidacy and the effect on MSU Extension's contract renewal with the County. Moore told Plaintiff that if this involved any other County but Ottawa, there would not be a risk of MSU Extension being defunded because of Plaintiff's political activities. However, Moore told Plaintiff that the controlling OI Majority of the Ottawa County Commission sought vengeance and would seek to defund anyone it viewed as "against" the OI Majority. Moore speculated that the MSU Extension renewal contract may have been pulled from the consent agenda because of Plaintiff's role on the Ottawa Food Advisory Board. Further, Moore expressed her view that whoever controlled the Commission "controlled" MSU Extension in Ottawa County. Defendant Moore was clear, however, that Plaintiff running for county office

8

while working for MSU Extension was only a problem because it was in Ottawa County and would not have been a problem if "it were any other county."

34.    During that meeting, Moore never told Plaintiff that there was any possibility that he would lose his job at MSU Extension if he won the recall election. On the contrary, Moore told Plaintiff that he would have to abstain on any votes related to MSU Extension if he won the Commission seat. She noted, however, that even if Plaintiff abstained from such votes due to conflict of interest, the OI Majority of the Commission might still retaliate against Plaintiff and/or MSU Extension. Defendant Moore told Plaintiff that his political speech and his running against Ebel in the recall election could cause the OI Majority to retaliate against MSU Extension in ways that could cost his co-workers their jobs or otherwise hurt the position of MSU Extension in the County. Defendant Moore also emphasized to Plaintiff that this potential for retaliation would outlast any eventual renewal of the MSU Extension contract with the County.

35.    Plaintiff hoped to delay announcing his candidacy until after the Commission approved the contract with MSU Extension because he believed, and was concerned, that the OI Majority would retaliate against his employer once they learned he was running against Ebel.  Once the recall election was certified, however, Plaintiff learned that the Ottawa County Democratic Party had to announce their candidate within 10 days.  Thus, Plaintiff announced that he was running in the recall election on December 6, 2023.

36.    On December 7, 2023, Kelly and Defendant Korpak attended the previously scheduled meeting with Commissioners Moss and Miedema.  Although the intent of the meeting was for Kelly and Defendant Korpak to provide information about MSU Extension's programs, Defendant Moss shifted the conversation to Plaintiff's political activities and his employment with MSU Extension.

37.    Defendant Shane later described what happened at the meeting to Plaintiff, who was neither present nor invited to the December 7 meeting. Defendant Shane told Plaintiff that Shane understood the intent of the meeting was to provide an overview of MSU Extension's programs to Miedema as the Commission liaison and to discuss the contract between MSU Extension and the County. As Defendant Shane described, however, Moss and Miedema soon pivoted the conversation to Plaintiff's candidacy and his work with MSU Extension. Kelly and Defendant Korpak explained that MSU Extension's Handbook policies did not prohibit Plaintiff from working there and campaigning for a seat on the Commission, and that Plaintiff had rights as a private citizen to run for office. Miedema and Defendant Moss expressed their dislike and disagreement with those policies.

38.    As Defendant Shane reported to Plaintiff when they spoke on December 14, 2023, Defendant Moss asked that MSU Extension officials pull Plaintiff out of work in Ottawa County even during his campaign for office in the recall election, and that MSU Extension move Plaintiff to another county, another location, or some other work. Further, Defendant Shane told Plaintiff that Miedema and Defendant Moss said that the MSU Extension contract renewal would not be approved by the

Commission or on the agenda until MSU Extension removed Plaintiff from work in Ottawa County. Defendant Shane told Plaintiff that the contract renewal "…for Ottawa County will be on hold indefinitely, or at least for the foreseeable future, and not make it on a board agenda to have further discussion, which obviously has impact on our 4-H and agriculture programs."

39.    Defendant Shane also reported to Plaintiff that Miedema and Defendant Moss insinuated that MSU Extension's office space in Ottawa County property would be in jeopardy. As Shane said to Plaintiff, "There was also some mention in that meeting about how highly desirable our Ottawa County MSU Extension space is in that building, and that there are other departments that certainly would benefit from having access to that space as they look at restructuring some of their other departments and forming other departments and offices within the county."

40.    Defendant Korpak interpreted Defendant Moss's statements about Plaintiff's employment as a thinly-veiled threat against MSU Extension.  Defendant Moss made clear to Defendant Korpak that he was not happy about Plaintiff's political activity or involvement in the recall process. Defendant Korpak understood that Defendant Moss wanted MSU Extension to agree to take action against Plaintiff in retaliation for Plaintiff's First Amendment-protected activities.

41.    Kelly and Defendant Korpak did not provide a definitive response to Defendant Moss's request that MSU Extension change the terms of Plaintiff's employment at the December 7 meeting.  Rather, Kelly and Defendant Korpak told

Defendant Moss that they would follow up with a response from MSU Extension leadership.

42.    When Defendant Shane described this meeting to Plaintiff at their December 14, 2024, conversation, Defendant Shane assured Plaintiff that even though Miedema and Defendants Moss were threatening to hold up MSU Extension's contract renewal with Ottawa County while Plaintiff worked for MSU Extension and was campaigning for a Commission seat, that Plaintiff was not at risk of losing his job. Defendant Shane told Plaintiff that Miedema and Defendant Moss wanted a response from MSU Extension officials by the following week about what it intended to do regarding Plaintiff's employment and that MSU Extension was intentionally delaying its response.

43.    Defendants never further updated Plaintiff about his employment after this December 14, 2023 meeting until after the recall election in May 2024.

44.    On December 15, 2024, Defendant Moss sent an email to Kelly and Defendant Korpak following up on their December 7 meeting. Defendant Moss attached several of Plaintiff's social media posts that were critical of funding cuts passed by the Commission. Defendant Moss described Plaintiff's posts as "lies" and "false and inflammatory." Although the posts were made on Plaintiff's personal social media page and were not attributed to MSU Extension, Defendant Moss expressed his concern about an MSU Extension employee engaging in political speech.

45.    MSU Extension officials did not immediately send a response to Defendant Moss's email, consistent with Defendant Shane's statement to Plaintiff

that MSU Extension intended to delay its response. On December 27, 2023, Defendant Moss emailed Defendant Korpak to tell him again that he was awaiting a response.

46.    Upon information and belief, on January 5, 2024, Kelly and Defendant Korpak met again with Defendant Moss to discuss Defendant Moss's request that MSU Extension change the terms of Plaintiff's employment. Kelly followed up with an email to Defendant Moss that attached a letter from Defendant Shane.

47.    In his letter, Defendant Shane said that MSU Extension could not cede Defendant Moss's request that MSU Extension change the terms of Plaintiff's employment because of his political activities. Defendant Shane's email noted that he recognized that Defendant Moss had not achieved his desired result, but Shane again asked Defendant Moss to place the contract with MSU Extension back on the Commission's consent agenda.

48.    On January 8, 2024, Kelly emailed Defendant Moss to inform him that Kelly had received an inquiry from a Holland Sentinel newspaper reporter about the Commission's delay in approving the contract with MSU Extension. At the time, the Holland Sentinel had been doing extensive investigative reporting on OI Majority activities and policies for several months, and the coverage from this and other news outlets had focused an unusual level of public attention on the OI Majority and Commission activities generally. Kelly told Defendant Moss that the inquiry specifically referenced Plaintiff's candidacy and connection with Ottawa Food as

potential reasons for the delay. After learning of this media inquiry, Defendant Moss then agreed to put the contract on the next meeting's agenda.

49.     On January 16, 2024, the OI Majority returned the MSU Extension contract renewal to the consent agenda, and it was approved unanimously by the entire Board without discussion.

50.     On May 7, 2024, Plaintiff won the recall election and defeated Lucy Ebel by a 20% margin. In so doing, Plaintiff became only the second Democrat ever to win a seat on the Ottawa County Commission.

51.     Sometime after the recall election, Interim County Administrator Jon Anderson visited the office of MSU Extension in Ottawa County, which is currently in the Ottawa County Fillmore Complex. The County has leased the space to MSU Extension in Fillmore Complex, which is the main hub of county government operations, for its operations in Ottawa County for many years.

52.     Upon information and belief, Anderson has no prior experience as a county administrator or in county administration. However, Anderson was the OI-endorsed candidate for County Sheriff in the November 2024 election, and the OI Majority installed him without a public interview or search process after firing its prior County Administrator, John Gibbs, who was also a political appointee of the OI Majority. Anderson is closely aligned with Defendant Moss and the OI Majority.

53.     In his visit to the MSU Extension Office in Ottawa County after Plaintiff's defeat of OI Majority member Lucy Ebel in the recall election, Anderson made a public display of coming to examine the office for the purpose of moving

14

another county department into it and MSU Extension out of it. Anderson declared – in front of MSU Extension employees – that the County would need at least some, if not all, of the office space currently inhabited by MSU Extension for new County departments that the OI Majority intended to create or to make room for an office shuffle. Anderson also said that "maybe" the County would move the MSU Extension Office to the basement of the building housing the MDHHS's Ottawa County location, which is on James Street in Holland. The MDHHS building is located at the edge of the County in Holland, instead of in the center of the County in West Olive where Fillmore Complex is located. The MDHHS building sees less foot traffic because of its much smaller size and the limited number of departments housed within it, and it is much more physically isolated from the County operations in the administration building which is part of Fillmore Complex. Fillmore Complex is a modern, much newer campus of buildings than the single building housing MDHHS.

54.    Upon information and belief, Anderson's visit to the MSU Extension Office space was intended to be a threat of retaliation against MSU Extension for Plaintiff's political activities and recall election victory, and Defendants and the local office staff felt it as such. Anderson's visit to the office space and threat that MSU Extension would be relocated by the County was a continuation of the original, overt threat voiced by Defendant Moss in the December 7, 2023 meeting that Moss and Commissioner Miedema had with Defendant Korpak and Kelly.

55.    Defendant Korpak has worked with MSU Extension staff to prepare a document for County officials detailing the uses of the space by MSU Extension's Ottawa County office personnel, trying to head off the loss of the current office space.

56.    Ottawa County is a particularly important location for MSU Extension's work. It is the seventh largest county in the state and the fastest growing county. Ottawa County is also the home to more agricultural business than any other county in the state.

57.    On May 23, 2024, Defendant Shane initiated a meeting with Plaintiff and – essentially reading from a prepared document – told Plaintiff that he could not work at MSU Extension while he was an Ottawa County Commissioner. Defendants Korpak and Moore were also present in the meeting. Defendant Shane told Plaintiff that he was a "valued" employee, but that he could not continue to work for MSU Extension while he was a County Commissioner because it would violate the MSU Extension Handbook – the same Handbook that Shane told Moss and Miedema in December did not prevent Plaintiff from holding both roles. Defendant Shane also told Plaintiff that being in both roles would violate a state law prohibiting the holding of more than one "incompatible" public offices, i.e., Mich. Comp. Laws § 15.181 et seq. Defendant Shane told Plaintiff that he and the others did not see a path for Plaintiff to continue working for MSU Extension while he was an Ottawa County Commissioner, even in a different capacity or in another county.

16

58.    Defendants never told Plaintiff prior to May 23, 2024 that MSU Extension would terminate Plaintiff's employment if he was sworn into a seat on the Ottawa County Commission.

59.    Prior to May 23, 2024, Defendants never mentioned Mich. Comp. Laws § 15.181 et seq., or the Incompatible Offices Act, to Plaintiff nor told him that this statute allegedly was a legal impediment to Plaintiff's continued employment with MSU Extension while he was a County Commissioner.

60.    Defendants told Plaintiff that MSU Extension was immediately placing him on unpaid leave through December 31, 2024. Defendants told Plaintiff his employment would be permanently terminated if he won the full four-year Commission term in November 2024. Finally, Defendants told Plaintiff that if he did not agree to the plan wherein Defendants were placing him on unpaid leave immediately through December 31, 2024, he would be permanently fired immediately.

61.    When Plaintiff asked why he could not simply take a transfer to another county if MSU Extension was concerned about a conflict of interest with Ottawa County, Defendant Shane told him that he was "oversimplifying" the alleged problem. Shane said, "Because Extension is a statewide, county-wide organization that has many partnerships in Ottawa County and connections that you work with that have some connection to Ottawa County government … there's a lot of implications of how Extension does work in the county. It's not necessarily just about one contract and one budget vote. That's not where the university sees the conflict. Inherently, that's

part of it, but it's not the whole of it. … Because of the nature of the work that we do within the county, it's impossible to separate the work of Extension and the role of county commissioner."

62.    Upon information and belief, though, the real reason that Defendants put Plaintiff on unpaid leave with a plan to fire him entirely if he won a regular four-year term in November 2024 was because of: (a) Plaintiff's political membership in the Democratic Party and filing to run in the recall and regular Commission elections as a Democrat; (b) Plaintiff's lack of alignment with the OI Majority; (c) Plaintiff's public statements challenging actions of the OI Majority, including the loss of the Ottawa Food coordinator; (d) Plaintiff's work in the recall committee efforts against now former-Commissioner Ebel; and (e) Defendants Moss's intimidation of Defendants via Moss's actual and implied threats, both made personally and at his direction, of further and continuing retaliation against MSU Extension if MSU Extension did not terminate Plaintiff's employment and/or move him out of Ottawa County.

63.    Upon information and belief, Defendants' reliance on alleged legal advice that they needed to fire Plaintiff because of the potential of conflicts of interest and/or because of the Incompatible Offices Act is a pretext for the real reason for the decision to fire him, which was, in actuality, to sidestep further and continuing attempts at retaliation by Defendant Moss and the OI Majority on the Commission.

64.    By May 23, 2024, the filing deadline for a candidate to run for county office in the August 2024 primary and November 2024 general elections had already

passed as of April 23, 2024. Had Plaintiff decided he needed to withdraw from the race because he could not permanently risk his employment with MSU Extension by running and potentially winning a regular four-year term in November 2024, his withdrawal from the race would have meant there was no Democrat on the ballot in the District 2 Commission election – and no opposition candidate on the ballot to whoever won the Republican primary, which included the recalled Ebel.

65.    Upon information and belief, Defendants Korpak, Shane, and Moore were the final decisionmakers on behalf of MSU Extension and all participated in the decision to put Plaintiff on unpaid leave through December 31, 2024, with a plan to terminate his employment entirely if he won a four-year Commission term in November 2024.

66.    Plaintiff ultimately refused to agree with MSU Extension to remain on unpaid leave and protested the lawfulness of Defendants' decisions. On May 31, 2024, Plaintiff filed a grievance challenging the decision and the alleged legal bases for it, under the grievance procedure offered to MSU Extension employees to challenge adverse employment determinations.

67.    Instead of spending any time reviewing the grievance or hearing arguments about Defendants' alleged reliance on legal arguments that Plaintiff could not work at MSU Extension while serving as a County Commissioner, the head of Human Resources for MSU Extension, Jessica Nakfour, on May 31, 2024, informed Plaintiff that Defendants permanently terminated Plaintiff's employment effective June 4, 2024. Ms. Nakfour then advised Plaintiff to file his grievance under a

different electronic system than where he had initially filed his grievance, which he did.

68.     MSU Extension never responded substantively to Plaintiff's grievance.

69.     On June 6, 2024, Interim County Administrator Jon Anderson emailed Plaintiff, saying, "Hi Chris – hope all is well and you're settling in. I had a reminder from my notes to check with you about your position with MSU. I do not have any personal knowledge about a potential conflict of interest, but I recall there was a question about a potential conflict of interest when you were elected. If there is anything you need, please reach out." There has been no mention at a public meeting about a conflict of interest with Plaintiff's Board of Commissioners service and his job with MSU Extension. The most likely reason that Anderson would have raised this issue with Plaintiff is because of private direction from the OI Majority related to Plaintiff's job at MSU Extension.

70.     On June 13, 2024, Plaintiff's attorney contacted MSU Extension via an emailed letter and asked to be put in touch with its legal counsel. Plaintiff's attorney's letter detailed counterarguments and legal citations that Defendants' termination of Plaintiff was neither legally required nor permitted. Neither MSU Extension nor its lawyers responded to this letter from Plaintiff's attorney.

71.     One of MSU Extension's public education efforts is its authorship and updating of the primary resource book on the operations of county governments in Michigan, *Guide to Michigan County Government*. MSU Extension trains and has trained thousands of new and returning county commissioners on their

responsibilities and various legal issues confronting county commissions. In *Guide to Michigan County Government* at page 3-23, MSU Extension specifically details that the appropriate way to determine if there is a problem with a county commissioner's employment and role as a county commissioner under the Incompatible Offices Act is to either: (a) file an action with the local county circuit court for a court determination of the issue, or (b) ask the Attorney General's Office for advisory opinion. MSU Extension did not do either of those things to confirm its alleged legal conclusion that Plaintiff could not both work for MSU Extension and serve as a county commissioner at the same time. Defendants did not take either of those steps – and instead simply just fired a long-standing, good employee effective immediately – despite knowing the appropriate way to obtain a determination of the issue under state law, and despite allegedly determining that this was a barrier in at least December 2023, more than five months prior to when the issue could come to a head if Plaintiff won the recall election.

72.    Had Plaintiff known of Defendants' alleged position that the Incompatible Offices Act prevented his continued employment at MSU Extension, Plaintiff, through his attorney, would have sought a determination on this question from the Ottawa County Circuit Court and/or the Attorney General's Office so that an answer could have been provided by one of these routes sooner than May 2024.

73.    Plaintiff and his family could not financially afford to go without Plaintiff's employment income and health insurance benefits for any significant length of time, so Plaintiff sought and accepted another, new job which began in

August 2024. However, Plaintiff had banked at least 240 vacation hours with his prior position at MSU Extension, of which he planned to use a part to campaign for the November 2024 general election. Plaintiff will no longer have access to that vacation time as he begins his new job, which will cause his campaign to keep his County Commission seat in the November 2024 general election to suffer. Defendants Korpak, Shane and Moore's termination of Plaintiff's MSU Extension employment will limit his ability to engage in the same amount of political speech and activity during his vacation time that Plaintiff otherwise would have chosen.

### COUNT I – VIOLATION OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION – 42 U.S.C. § 1983 AS TO DEFENDANTS SHANE, KORPAK, and MOORE

74.     Plaintiff relies on the allegations of all prior paragraphs, as if they were restated herein.

75.     The actual reason for Defendants Korpak, Shane, and Moore for the decision to place Plaintiff on unpaid leave and ultimately to fire him from his job is that they have bowed, and are bowing, to political pressure from Defendant Moss and the OI Majority on the Ottawa County Commission. Defendant Moss placed political pressure on Defendants Korpak, Shane, and Moore to retaliate against Plaintiff for Plaintiff running against and winning a recall election to unseat the OI Majority's political ally, Lucy Ebel. Defendants Korpak, Shane, and Moore do not have an actual non-discriminatory reason to fire Plaintiff and have merely capitulated to Defendant Moss and the OI Majority.

76.     In addition, Defendant Moss applied pressure to Defendants Korpak, Shane, and Moore to fire or move Plaintiff's employment, and otherwise negatively impact Plaintiff's working conditions and livelihood, in an effort to deter a viable candidate from running against Ebel. Finally, Defendants Moss and the OI Majority also hoped to punish and retaliate against Plaintiff for his political opposition to the OI Majority's budget cuts that led to the elimination of the Ottawa Food coordinator, and Defendant Moss and the OI Majority applied pressure to Defendants Korpak, Shane, and Moore to punish Plaintiff for this reason as well.

77.     Defendant Moss has engaged in overt and veiled efforts to retaliate against Plaintiff for Plaintiff's First Amendment-protected activity, to chill Plaintiff and others from mounting similar challenges to Defendant Moss's and the OI Majority's activities. in the campaign for the November 2024 general election, and in the future.

78.     Had Plaintiff run for political office on his own time in another county, or had he run as an OI-aligned Republican in Ottawa County, Defendants Korpak, Shane, and Moore would not have feared negative consequences from the OI Majority and would not have caved to that pressure by terminating Plaintiff's employment.

79.     Defendants Korpak, Shane, and Moore are treating Plaintiff differently and making decisions about his employment based on Plaintiff's political beliefs and memberships, and Plaintiff's candidacy for public office.

80.     Defendants Korpak's, Shane's, and Moore's stated reasons for terminating Plaintiff's employment are neither legitimate, correct, nor the actual

motivations for their actions. These Defendants' stated reasons are a pretext for unlawful discrimination which violates the First Amendment.

81.    Defendants Korpak, Shane, and Moore are state actors.

82.    The actions of Defendants Korpak, Shane, and Moore violated Plaintiff's First Amendment rights.

## RELIEF SOUGHT

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A.    Declare that Defendants must adopt and abide by a policy of non-discrimination for outside political activities by employees on their personal time;

B.    Declare that Defendants must return Plaintiff to his employment position immediately, and award all other necessary and appropriate injunctive relief;

C.    Award Plaintiff his economic damages in the form of back wages;

D.    Award Plaintiff compensation for all of his non-economic damages, including pain, suffering, stress and anxiety;

E.    Award Plaintiff punitive and exemplary damages;

F.    Award Plaintiff costs and reasonable attorney fees; and

G.    Award Plaintiff such other relief as may be just and equitable.

## COUNT II – VIOLATION OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION – 42 U.S.C. § 1983 AS TO DEFENDANT MOSS

83.    Plaintiff relies on the allegations of all prior paragraphs, as if they were restated herein.

24

84.     Plaintiff engaged in political speech when he voiced his opposition to the policies of the OI Majority. Plaintiff's participation on the Ottawa Food board, social media posts, and ultimate decision to run against a member of the OI majority as a Democrat constituted political speech and political activity protected by the First Amendment.

85.     Plaintiff engaged in political speech when he participated in the efforts of the Committee to Recall Lucy Ebel to obtain the necessary voter signatures on recall petitions for the Clerk to be required under Michigan law to certify a recall election against Ebel for the May 2024 ballot. Plaintiff's participation in the recall committee efforts constituted political speech protected by the First Amendment.

86.     Defendant Moss retaliated against Plaintiff for his protected speech by refusing to adopt the renewal contract with Plaintiff's employer.  Defendant Moss's decision to remove the contract from the consent agenda and hold up the adoption of the contract for several months was made in an effort to retaliate against Plaintiff for his political speech by withholding funds from Plaintiff's employer, MSU Extension.

87.     Plaintiff was aware that his employer could lose an important source of funding because of his political speech, and that the loss of such funding could adversely affect his working conditions and those of his co-workers. Plaintiff attempted to delay the announcement of his candidacy, which could have put him at a disadvantage in the recall election, because of Defendant Moss's retaliation against him.

88.     Defendant Moss further pressured MSU Extension to relocate Plaintiff or otherwise negatively impact Plaintiff's working conditions and livelihood in an effort to punish and retaliate against Plaintiff for his political speech in opposition to the OI Majority's policies, including its budget cuts that led to the elimination of the Ottawa Food coordinator, and in an effort to deter a viable candidate from running against Ebel, Defendant Moss's political ally.

89.     Upon information and belief, Defendant Moss has continued a campaign to pressure MSU Extension to take adverse employment action against Plaintiff by covert and indirect methods, like directing and continuing the thinly-veiled threats on MSU Extension's current prime office space location within the County.

90.     Defendant Moss's overt and covert efforts to force MSU Extension to take action against Plaintiff impeded Plaintiff's political speech by forcing him to find alternative employment and lose 240 hours of vacation time that Plaintiff could have used if he were still employed by MSU Extension to engage in campaign-related activities. That action will restrict Plaintiff's ability to fully engage in his campaign in a way that he could have if he had maintained his previous employment and corresponding vacation time.

91.     Defendant Moss's threats to Plaintiff's employer and Plaintiff's livelihood would deter a person of ordinary firmness from engaging in protected conduct.

92.     Defendant Moss's actions were taken under color of state law.

93.     Defendant Moss's actions violated Plaintiff's First Amendment rights.

26

## RELIEF SOUGHT

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A.      Declare that Defendant Moss violated Plaintiff's First Amendment rights;

B.      Declare that Defendant Moss must discontinue efforts to retaliate against political opponents for the protected conduct, and award appropriate injunctive relief;

C.      Award Plaintiff economic damages;

D.      Award Plaintiff compensation for all of his non-economic damages, including pain, suffering, stress and anxiety;

E.      Award Plaintiff punitive and exemplary damages;

F.      Award Plaintiff costs and reasonable attorney fees; and

G.      Award Plaintiff such other relief as may be just and equitable.

PINSKY SMITH, PC
Attorneys for Plaintiff

Dated: August 20, 2024            By:    /s/ Sarah R. Howard
                                          Sarah Riley Howard
                                          Elizabeth L. Geary
                                          146 Monroe Center N.W., Suite 418
                                          Grand Rapids, MI 49503
                                          (616) 451-8496
                                          showard@pinskysmith.com

## JURY DEMAND

To the extent that jury trial is available as to any of the issues set forth above, Plaintiff hereby demands same.

PINSKY SMITH, PC
Attorneys for Plaintiff

Dated: August 20, 2024          By:    /s/ Sarah R. Howard
                                       Sarah Riley Howard
                                       Elizabeth L. Geary
                                       146 Monroe Center St NW, Suite 418
                                       Grand Rapids, MI 49503
                                       (616) 451-8496
                                       showard@pinskysmith.com