CORRECTED

**EXHIBIT 1**

Page 78

1  mission to serve and educate all citizens
2  irrespective of their political affiliations. We
3  too have reservations about this employee's
4  political activities. Simultaneously, we
5  acknowledge our commitment to uphold this
6  employee's rights to engage in politics as an
7  American citizen. To decide on the course of
8  action we examined Michigan State University's
9  guidelines for participation in political
10 activities and ballot initiatives along with
11 section 57 of the Michigan campaign finance
12 attack, which provides clearly defined parameters
13 for MSU Extension employees. Subsequently, we
14 sought guidance from the university's general
15 counsel. Given the information available to us,
16 MSU Extension is unable to relocate this employee
17 to a different location."
18     Did I read that correctly?
19  A  Yes.
20  Q  Christian, is it correct that it's your
21 position in this lawsuit that Joe Moss sought to hold
22 up what's commonly referred to as a "memorandum of
23 understanding" that provides funding to extension as a
24 means to try to get MSU Extension to transfer you out
25 of the county?

Page 79

1  A  Yes.
2  Q  Okay. So do you know when the memorandum of
3 understanding was initially removed from the Ottawa
4 County consent agenda?
5  A  In -- I believe it was the November meeting,
6 but I am not 100 percent sure.
7  Q  November of '23?
8  A  '23, yes.
9  Q  Okay. So you agree with me that in November
10 of '23, the MOU, or memorandum of understanding, was
11 removed from the consent agenda, and then there were
12 discussions happening between Matt Shane and
13 Scott Korpak, Joe Moss and John Gibbs, Matt Shane and
14 Scott Korpak and yourself, about these issues about
15 how that may be informed by your campaign; is that
16 right?
17  A  Yes.
18  Q  Okay. And do you also agree with me that
19 based on what's been marked as Exhibits B and C, the
20 university declined to move you out of the county or
21 otherwise retaliate against you because you were
22 campaigning for a commissioner seat?
23  A  For that campaign, yes.
24  Q  Okay. Was MSU supportive of you during your
25 campaign in the recall election?

Page 80

1  A  I don't -- could you flesh that out a little
2 bit as to how you're defining "supportive"?
3  Q  You said that there were guidelines
4 implemented with respect to how you campaigned?
5  A  Yes.
6  Q  Okay. You said earlier that you thought
7 those guidelines were fair?
8  A  Yes.
9  Q  Did they apply them in what you considered
10 to be a fair and reasonable way?
11  A  Yes, insofar as questions I had were
12 responded to quickly.
13  Q  Okay.
14  A  That's -- I mean, yes. If that's -- if
15 that's -- if you are -- we both kept our end of the
16 deal, if that's what you're -- if that's how we're
17 defining supportive, then yes, they were supportive.
18  Q  I guess let me ask it this way. In terms of
19 what you would expect from an employer during the time
20 that you were campaigning during the recall election,
21 did they make it possible for you to do that? Did
22 they make it possible for you to do it?
23  A  Yes.
24  Q  Okay. I asked this before, but did they do
25 anything to prevent you or discourage you from doing

Page 81

1 that?
2  A  No.
3  Q  Okay. So that's why I asked. Did you feel
4 that they were supportive of your efforts to run as an
5 employee of theirs? I am not asking if they gave you
6 money, but that they supported you in your efforts.
7  A  Yes.
8  Q  Okay. And again, referring to B and C, when
9 they were asked to transfer you out of the county,
10 they declined to do so; right?
11  A  Correct.
12  Q  Okay.
13     MS. HOWARD: Counsel, I don't need to
14 take a lunch break right now. I just wanted to ask
15 you about your general intentions.
16     MR. DANIELS: You want to go off the
17 record for a minute?
18     THE REPORTER: Yeah. We are off the
19 record at 12:23.
20     (Off the record.)
21     THE REPORTER: We are back on the
22 record at 12:51.
23 BY MR. DANIELS:
24  Q  All right. Mr. Kleinjans, first of all,
25 sorry if I call you "Christian" periodically. I am

Page 82

1  trying to keep it formal, but --
2     A   No, that's fine.
3     Q   Okay.  So did you testify previously that
4  you were elected to the District 2 commissioner seat
5  on May 5th?
6     A   Yes.
7     Q   Okay.  Other than your meeting with
8  Matt Shane in December of '23 -- strike that.  After
9  your meeting with Matt Shane in December of '23 until
10 May 5th of '24, did you talk to anyone at extension
11 about your campaign?
12    A   I had several.  I reached out to
13 Scott Korpak a few times when some situations come
14 up -- came up that I felt needed some guidance, or I
15 just wanted to back check.  And informally at the
16 spring conference in April, Erin asked me how the
17 campaign was going.
18    Q   And when you say that you had discussions
19 with Scott Korpak, were those talks limited to
20 questions you had about the guidelines that extension
21 had laid out for your campaign and how you presented
22 yourself?
23    A   Yes.  One was a question about being filmed
24 in my capacity as a community nutrition instructor for
25 use by one of the nonprofits I was working with.

Page 83

1  Another one was largely just informative, because of
2  an incident that happened at a commissioner meeting.
3  But they were related to these are questions I have
4  that I feel --
5     Q   Okay.  And in one of those instances, did
6  you have a question about wearing, like, a Michigan
7  State T-shirt for a video that you were making as part
8  of the campaign?
9     A   I don't recall.  So I -- the -- the no logo
10 wear was very -- I see what you're saying, though.
11 Random MSU gear, I stayed away from anything that had
12 MSU on it.
13    Q   Okay.  I guess I am just asking, do you
14 recall when you emailed Scott Korpak about the
15 question you had regarding guidelines for a video?  Do
16 you remember specifically what that was about?
17    A   It was because I would be -- my name and my
18 position would be on that video, as part of the
19 header, and I wanted to make sure that that wasn't
20 running afoul of the guidelines that -- that had been
21 set up.
22    Q   Okay.  And you and Scott figured it out
23 okay?
24    A   Yes.
25    Q   Okay.  And then you said that you had a

Page 84

1  discussion with Scott on a separate occasion about an
2  incident that occurred at a board meeting; is that
3  right?
4     A   Yes.
5     Q   Okay.  And did that relate to comments that
6  were made at the board meeting about your campaign
7  efforts or about your running?
8     A   No.  It related to a member of the public
9  showing up to a board of commissioners meeting wearing
10 a Chris Kleinjans for Commissioner hat and sweatshirt,
11 and very aggressively castigating the board chair and
12 the board of commissioners.
13    Q   Okay.  And so you felt inclined to --
14    A   I felt that they should be informed.
15    Q   -- let Scott know about that?  Okay.  Do you
16 remember what Scott's response was?
17    A   "Don't worry about it.  People are people,"
18 essentially.
19    Q   Okay.  And you said the third instance was
20 you spoke briefly at a spring conference with Erin
21 about your campaign?
22    A   Yes.
23    Q   Okay.  Do you know when the spring
24 conference was?
25    A   It was, I believe, two -- two weeks before

Page 85

1  the election.  It was very -- it was very close to
2  when the election occurred, so mid-April, I would be
3  somewhat confident of saying.
4     Q   Okay.  Where was the spring conference held?
5     A   It was Gaylord, yes.  Okay.
6     Q   And was anybody else present for your
7  discussion with Erin?
8     A   We were in a public gathering space.
9     Q   Okay.  And she just asked how the campaign
10 was going?
11    A   Yes.
12    Q   Okay.  And do you remember what you told
13 her?
14    A   I said it was going fine.
15    Q   Okay.  So other than what we've just
16 discussed, did you have any discussions with anyone
17 from extension or any communications with anyone from
18 extension about the campaign phase?
19    A   No.
20    Q   Okay.  When was the next time, then, after
21 you were elected on May 5th of '24, that you had
22 interactions with MSU Extension about what was going
23 to happen after you were elected?
24    A   I didn't have discussions about what was
25 going to happen after until it had happened.

22 (Pages 82 - 85)

Page 86

1  Q  Okay. So after May 5th, then, describe for
2  me the next time that you had communications with
3  extension about your role as a commissioner.
4  A  I had a meeting with Scott shortly after the
5  election where we both agreed that this phase went
6  well, that this -- that I was above and beyond as far
7  as keeping the separation and maintaining the two
8  spaces without having them get mixed in with each
9  other. And I at that point said something to -- I
10 said that I felt that continuing to operate in both of
11 these capacities was -- was -- was an absolute
12 possibility.
13 Q  Okay. Do you recall when that discussion
14 with Scott was?
15 A  It was in the office at Fillmore. I don't
16 know the exact date.
17 Q  Sometime after May 5th?
18 A  Yes.
19 Q  Okay. And did you have any discussions with
20 anyone from MSU Extension during the campaign phase
21 about what would happen if you were elected?
22 A  The last thing I recall remembering was at
23 one of the meetings, it was after these pieces had
24 been decided, it was to do this and see what happens
25 after that.

Page 87

1  That was the -- I -- the things that get
2  stuck in your head, that was the piece that got stuck
3  in my head. I said -- I had said "Okay, so I will run
4  the campaign and we'll see what happens after." And I
5  don't recall who said "Yes," but someone said "Okay."
6  Q  Okay. Did anyone represent to you at any
7  time before May 5th that if you were elected you'd be
8  able to maintain your position as a community
9  nutrition instructor?
10 A  I don't recall discussion pro or con. The
11 things I recall from those meetings had everything to
12 do with the campaign.
13 Q  Okay. In your own mind, leading up to
14 May 5th, did you have any concerns that there would be
15 an issue with you maintaining employment as a
16 community nutrition instructor and serving as a
17 commissioner?
18 A  I did not.
19 Q  Okay. So why do you say that when you
20 talked to Scott Korpak after May 5 that you told him
21 you thought it would be possible for you to do both
22 roles?
23 A  Because it was -- I mean, it was something
24 that I felt the time commitment, because it was -- it
25 had everything to do with the time, the time to be a

Page 88

1  commissioner and the time to run the campaign. It
2  was -- I felt like I had kept my schedule cleared and
3  still fulfilled my responsibilities as an employee,
4  and yet still was able to devote enough time to a
5  campaign to be successful at it. I felt that equated
6  to there was space -- there was enough hours in the
7  day to do both.
8  Q  Okay. I guess why would you need to
9  communicate that to Scott Korpak if you didn't think
10 there was any possibility or any potential issue with
11 you serving as a community nutrition instructor and a
12 commissioner?
13 A  The subject of conflict of interest had been
14 thrown up at the very first meeting with Stephanie and
15 Erin, and so to not -- you know, to not acknowledge
16 that both pieces took time was -- would have been
17 naive.
18 Q  What talked about a conflict of interest,
19 Erin or Stephanie --
20 A  Erin.
21 Q  -- in the November meeting?
22 A  Sorry, Erin.
23 Q  What did she say?
24 A  She said she thought it might be a conflict
25 of interest, I believe.

Page 89

1  Q  Okay. So before you were elected, you were
2  cognizant of the fact that there may be challenges
3  related to time and commitments with respect to both
4  roles; is that fair?
5  A  Time and commitment, yeah. Time,
6  fundamentally,
7  Q  Right.
8  A  Yes.
9  Q  Okay. And let's talk about this. Were you
10 expected as a community nutrition instructor to
11 provide the programming that you did during normal
12 business hours?
13 A  Our business hours were flexible because
14 sometimes there was night programming, which, you
15 know, then activated flex time. And some of the -- we
16 programmed when our partners were available, not when
17 it was convenient to us. So to say that it was an
18 eight to four is true, but not necessarily accurate.
19 Q  Did you generally work from eight to four
20 Monday through Friday?
21 A  Yes.
22 Q  Okay. Are Ottawa County commissioners paid?
23 A  Yes.
24 Q  Okay. What ultimately was the time
25 commitment that you had to make in serving as a

Page 142

1  December, or if you chose not to utilize the leave of
2  absence MSU Extension's intention was to terminate
3  your employment; is that right?
4      A    Yes.
5      Q    Okay.  On June 4th, you were terminated.
6      A    Yes.
7      Q    Indicates here that there's notes that the
8  MSU defendants have submitted in the case that
9  indicates your grievance would not be approved, or
10 rather that it would be denied; is that right?
11     A    Yes.
12     Q    Okay.  It says here "It appears that MSU
13 Extension had the intention to terminate Plaintiff's
14 employment and comply with Defendant Moss and Ottawa
15 County OI commissioners' desires regardless of
16 Plaintiff's attempts to appeal his termination."
17          Do you have any information or reason to
18 believe that Joe Moss or any other commissioner was
19 seeking to interfere with your grievance process in
20 May or June of '24?
21     A    I am sorry.  Could you repeat that?
22     Q    Do you know of anyone, Joe Moss or any other
23 Ottawa Impact majority member, that was seeking to
24 influence how your grievance was handled in May or
25 June of '24?

Page 143

1      A    I do not.
2      Q    Okay.  Are you aware of any evidence or
3  information other than the John Anderson visit that
4  suggests Joe Moss or anyone in the Ottawa Impact
5  majority was seeking to influence MSU to do something
6  with respect to your employment after you were elected
7  in May of '24?
8      A    I do not.
9      Q    You don't?  Okay.
10          "On June 6, 2024, Mr. Anderson emailed Plaintiff
11          about a potential conflict of interest between
12          his position at MSU Extension and his seat on the
13          Ottawa County board of commissioners.  There was
14          no mention at a public commission meeting about a
15          conflict of interest with Plaintiff's board of
16          commissioners service and his job with extension.
17          John Moss testified that he spoke with
18          Mr. Anderson about whether Mr. Kleinjans could be
19          forced out of his employment.  It is an argument
20          that his job presented an unresolvable conflict
21          with his status as a county commissioner."
22          In what way does that evidence that MSU was
23 seeking to retaliate against you?
24     A    It's confirmation that I was going to be
25 put -- that I was put in a rather untenable situation

Page 144

1  where I had to choose between my livelihood and
2  continuing to fulfill the duties of the office I was
3  elected to because it was -- it had -- it appeared to
4  me that there was no -- there was going to be no
5  negotiations, whether there could be -- whether both
6  could happen, which I didn't agree with.
7      Q    But what does that have to do with
8  Mr. Anderson emailing you about a potential conflict
9  or Joe Moss taking a position on that matter?
10     A    That was the first -- when
11 Administrator Anderson emailed me -- or, texted me
12 that, that was the first I knew that anyone inside the
13 county had been discussing what up until then had been
14 discussed only with MSU.
15     Q    Okay.  Again, who is best situated to offer
16 testimony or evidence about why Mr. Anderson might
17 have emailed Plaintiff, or Scott Korpak for that
18 matter, about a potential conflict?
19          MS. HOWARD:  Objection.  Calls for
20 legal conclusion.  You may still answer.
21          THE WITNESS:  I wouldn't believe
22 John Anderson.
23 BY MR. DANIELS:
24     Q    Okay.  Would you be surprised to know that
25 John Anderson testified in his deposition that his

Page 145

1  emails about a potential conflict with respect to you
2  serving as a commissioner was absolutely not intended
3  to be a sign of potential retaliation against MSU
4  Extension?
5      A    That's a possible -- that's a possible
6  answer, yes.
7      Q    I mean, again, do you think that
8  John Anderson is lying about that?
9      A    I don't -- I don't know if it's lying.  I
10 don't know if it's completely true.  I wasn't there.
11 Again, you're asking me to judge the man off of my
12 limited knowledge of him.
13     Q    Okay.  Do you know of any specific evidence
14 that would suggest that Mr. Anderson's testimony about
15 this is untruthful?
16     A    I do not.
17     Q    Okay.  Second to last bullet point.  At a
18 commission meeting, Sylvia Rhodea -- am I saying that
19 correctly?
20          MS. HOWARD:  It's Rhodea.
21 BY MR. DANIELS:
22     Q    Rhodea said that the board didn't owe you
23 anything, and that reflects OI majority's negative
24 opinion of you.
25     A    Yes.