**EXHIBIT 2**

Page 66

1  to see if there's anything that -- in the rules and the
2  understanding of how that could happen.  In the discussions
3  that I was a part of with human resources, with the
4  attorney, it was my understanding that there was -- there
5  was no option and that was the message that -- to be shared.
6      I couldn't argue against what they had stated, and
7  so that was the -- that was the company line.
8 Q.  Did human resources and legal counsel tell you the company
9  line could be shared with the staff or give you further
10 direction about what you should tell staff?
11 A. I'm sure that they instructed me to say that it was a
12 personnel issue and that I could not make any comment.
13 Q. You did make some comment to them, right?
14 A. I did.
15 Q. And you felt that was probably -- you felt that was more
16 appropriate than saying nothing else?
17 A. I did.
18 Q. Okay.  Would it be fair to say that you either said
19 explicitly or left them with the impression that this wasn't
20 about Chris's performance or it solely had to do with this
21 issue of him being a county commissioner?  Is that fair?
22 A. From the handbook and the act, yes.
23 Q. Okay.  Did you state to Chris, along with other
24 MSU Extension officials, both in writing and in person, that
25 there was concern about how much time being an Ottawa County

Page 67
1  commissioner would take and whether or not that was possible
2  with his MSU Extension employment responsibilities?
3 A. Yeah, I don't think it was ever put in writing.  I do
4  remember that in a meeting with -- I believe it was with
5  Matt and Erin, maybe James was there as well, but there was
6  a mention that the meetings were long, that there was
7  additional meetings to be a part of a committee, that it
8  would be difficult, it would be impossible to put in the
9  40 hours required and -- within the manner that was expected
10 by those in his role.
11 Q. Chris, though, had a lot of flexibility in his job, you
12 would agree with that, right?
13 A. Yes.
14 Q. He set the schedule for when he made presentations or when
15 he met with community partners, correct?
16 A. Yes.
17 Q. That wasn't something that you managed for him?
18 A. It was not.
19 Q. Okay.  And did you talk with Chris about what Chris's plans
20 were to manage time off he had to be a county commissioner
21 with his job duties?
22 A. He shared with me that he saw it as reasonable and doable
23 between the discussion he had with his partners, between his
24 ability to take time off, and he felt like those could be --
25 could be managed.

Page 68
1 Q. Okay.
2 A. I shared that information, I passed that along.  You know, I
3  don't have -- I didn't, still don't, have much real
4  understanding of the work of a community nutrition
5  instructor or, you know, for that matter some of the other
6  roles at Extension.
7 Q. Did you have any reason to doubt Chris's assessment that
8  both could be done time-wise?
9 A. I wasn't in a position to take a hard stance on that because
10 I just didn't know.  You know, I -- yeah, it was just -- it
11 would be just completely conjecture on my part.  I don't --
12 I didn't have -- I didn't know.
13 Q. Okay.  And is it fair to say that when Chris or any other
14 employee that was downstream in your supervisory capacity
15 wanted to take paid time off neither you nor anybody else
16 made them justify why they wanted to take the PTO, right?
17     MR. DANIELS:  Objection, form, foundation.
18 A. So the interesting thing with MSU Extension and the director
19 role is the only people that I actually supervised was
20 support staff.  And so they called it the dotted line.  So I
21 had all these dotted lines, and Christian was a dotted line
22 for me, along with all the other staff.  So, you know, he --
23 his direct report was Stephanie, you know, that's who did
24 the evaluations and would have approved time off.  I didn't
25 have any role in that.  I was only -- yeah, it was just

Page 69
1  support staff, the secretaries and administrative staff that
2  I did.
3 BY MS. HOWARD:
4 Q. Okay.  For anyone that you supervised did you -- if they had
5  the PTO to take and you had no reason to think them taking
6  PTO at a particular time would interfere with their job
7  duties, did you inquire as to why they wanted the time off
8  or feel it your place to approve whether or not they needed
9  it?
10 A. No.
11 Q. Okay.  Did you ever talk to Joe Moss or anyone employed by
12 Ottawa County at any point to tell them if Chris won the
13 commission election he would not be able to continue to work
14 as an MSU Extension employee?
15 A. I don't remember ever having that conversation or ever
16 saying that to anybody.
17 Q. Okay.  Do you know if Mr. Kelly ever did?
18 A. I don't know whether he did or not.
19 Q. Do you know if Mr. Shane ever did?
20 A. I don't know that either.
21 Q. Okay.  Did you ever talk directly to Jon Anderson, who was
22 one of the interim county administrators for Ottawa County?
23 A. Did I ever talk to him?  Yes.
24 Q. Okay.  Do you remember ever discussing with Jon Anderson
25 anything about Chris Kleinjans prior to or after

Page 70

1  Mr. Kleinjans' election to the Ottawa County commission in
2  May of 2024?
3 A.  Yes. He sent me an email asking about the status of --
4 Q.  Jon Anderson?
5 A.  Yes.
6 Q.  And what did Mr. Anderson ask you about in his email?
7 A.  I think the gist of it was what was Christian's plan, what
8  was MSU's plan, you know, for -- was this doable or not.
9 Q.  Okay. Did you have any discussion with him after that
10  email? Oral discussion?
11 A.  No, I don't believe so.
12 Q.  So any communication you had with Mr. Anderson on that topic
13  occurred in writing?
14 A.  Yeah. I remember making sure that Matt knew that I had
15  gotten that question from Jon.
16 Q.  Matt Shane?
17 A.  Yeah.
18 Q.  Okay. Why did you talk to Matt Shane about that?
19 A.  Because it was a point of question of what was going to
20  happen. And it -- I'm trying to remember if that
21  conversation happened before Christian shared that he
22  thought he could do both or afterwards. I don't recall
23  that. I'm not sure.
24 Q.  Did Mr. Shane tell you anything about the impact on
25  MSU Extension's relationship with Ottawa County based on

Page 71

1  what was done with Mr. Kleinjans' employment?
2 A.  No. No, the concern was -- yeah, the concern was what do
3  the rules say, what can we do, what can't we, how does this
4  get processed with Christian.
5   There's always a concern, you know, as we know,
6  for liability, if there's concerns about personnel or not
7  proceeding correctly, and I think that was -- at least I
8  think that was always at the forefront of everyone's mind
9  during that entire time, was making sure that we followed
10  the rules, the guidelines, the policies, so that if they
11  ever came into question that's what you go back to.
12 Q.  Was there any sense, in your discussions with Mr. Shane,
13  that the conclusion that MSU Extension had a legal reason
14  why it could not continue to employ Mr. Kleinjans if he was
15  an Ottawa County commissioner would aid in resolving some of
16  the animosity with the Ottawa Impact commission majority?
17   MR. LAMB: Objection, form, foundation, calls for
18  a conclusion, a legal conclusion.
19 A.  There wasn't a concern about the relationship with the
20  commissioners or with Ottawa Impact.
21 BY MS. HOWARD:
22 Q.  No concern whatsoever at that point?
23 A.  No.
24 Q.  There wasn't any concern about continuing potential for
25  retaliation or anything else that Ottawa Impact might do if

Page 72

1  it was unhappy with MSU Extension?
2 A.  No.
3   You know, from a complete personal perspective, a
4  democrat had just won in Ottawa County in a special election
5  and it did not appear that, you know, Ottawa Impact
6  continued to have the same level of support as it had
7  before. They'd also not had any contact with them during
8  that time that had been anything but just normal. There
9  was -- Wenzel and Miedema were on the advisory council for
10  District 7, so they attended at least two of the advisory
11  council meetings during that time; there wasn't any issue or
12  animosity during that.
13 Q.  And had any Ottawa Impact commissioner ever come to those
14  advisory council meetings prior to November of 2023, from
15  what you were told?
16 A.  So there's always -- they get appointed every year, so there
17  was always a commissioner or two that was appointed to the
18  advisory. I don't think the advisory had met during that
19  time because Erin left and then the interim was James. So I
20  think the very first meeting as advisory was mine, and that
21  would have been in February.
22 Q.  Okay. Do you know if Erin had been able to meet with any
23  commissioners before she was done as the District 7
24  director?
25 A.  Yeah, I don't.

Page 73

1 Q.  Okay. Fair enough.
2   Have you ever personally discussed what to do with
3  respect to Chris's employment, or what the law required,
4  with Jessica Nakfour from human resources?
5 A.  Yes.
6 Q.  All right. Was that during the Mackinac Island meeting?
7 A.  That was one of many.
8 Q.  Okay. What other conversations did you have with
9  Ms. Nakfour in terms of timeline after, for example, Chris
10  was elected to the county commission?
11 A.  Yeah, it would have been sometime a few days after that when
12  there was conversations with Jessica, Matt Shane would have
13  been a part of that, the attorney was involved with that.
14  Kristine?
15 Q.  Kristine Moore?
16 A.  Yes. And so there were -- there must have at least been a
17  couple of phone calls about that.
18 Q.  Okay. And why was that group of people having conversations
19  about that if the decision had been made many months earlier
20  that if Chris won a seat on the commission he couldn't work
21  for MSU Extension anymore?
22 A.  I think there was a belief, at least on my part, that
23  Christian was going to, you know, resign or take a leave of
24  absence. And then when that wasn't the case, then, you
25  know, there were those like me who were trying to figure

Page 130

1 January with my client and Commissioner Miedema was that
2 they were suggesting that Mr. Kleinjans' role with
3 MSU Extension be transferred out of the county?
**4 A.  It was my understanding that they thought that there should**
**5     be some -- and that would be one of them -- actions for his**
**6     employment.**
7 Q.  Okay.  And MSU never went through with that even though
8     later on Mr. Kleinjans himself suggested that option?
**9 A.  That's correct.**
10           MR. LAMB:  I have no further questions.  Thanks.
11              E X A M I N A T I O N
12 BY MR. DANIELS:
13 Q.  Scott, just for purposes of the record, my name is
14     Matt Daniels.  Obviously you know who I am.  I have some
15     follow-up questions for you.
16           My questions are informed by the testimony you've
17     already given, so I'm going to have to jump around a little
18     bit.  But if I ask you something that you don't understand
19     or you're confused by, please let me know that and I'll
20     rephrase the question.  Okay?
**21 A.  (Witness nods head up and down.)**
22 Q.  Is that a yes?
**23 A.  Yes.**
24 Q.  There's been some testimony given today about Kelli, who was
25     a support person in the Ottawa County Extension office; is

Page 131

1     that right?
**2 A.  Yes.**
3 Q.  What's her last name?
**4 A.  Headley, Kelli Headley.**
5 Q.  Can you spell that for the record if you know?
**6 A.  H-e-a-d-l-e-y.**
7 Q.  We'll talk about this more broadly, but with respect to
8     Kelli Headley there are some allegations in the Complaint
9     and you've given some testimony here today about the fact
10    that she may have had some concerns about loss of office
11    space for Ottawa County Extension; is that right?
**12 A. Yes.**
13 Q.  And it's your understanding that that was connected in some
14    way to actions that the Ottawa County Board of Commissioners
15    had taken broadly but also with respect to Extension's MOA;
16    is that right?
**17 A.  Yeah, it really wasn't the whole commissioners, it was just**
**18     in conversation with Commissioner Moss and Miedema where**
**19     that had been discussed.**
20 Q.  Okay.  Well, here's my question:  Were concerns that Kelli
21    may have had about office space or what Ottawa Impact or
22    Joe Moss were doing, did that inform, as you understand it,
23    any decisions with respect to Christian Kleinjans'
24    employment with Extension?
**25 A.  No.**

Page 132

1 Q.  Okay.  And part and parcel of that, there are some
2     allegations in the Complaint and there's been some
3     discussion here today about a visit that Jon Anderson made
4     to the Ottawa Extension office at some point in the spring
5     of 2024; is that right?
**6 A.  Yes.**
7 Q.  And it's your testimony, correct me if I'm wrong, you don't
8     recall the exact date of that visit, right?
**9 A.  Yeah, I do not.**
10 Q. But you recall the visit occurring?
**11 A. Yes.**
12 Q.  All right.  Did you construe his visit in any way to be a
13    threat or a veiled threat against Extension?
**14 A. No.**
15 Q.  Specifically that if you or Extension did not terminate or
16    separate Mr. Kleinjans from his employment with Extension
17    you might lose your office space?
**18 A. No.**
19 Q.  Okay.  Similarly there's been some discussion about what was
20    previously marked as Exhibit 11, Scott.  Take a look at that
21    exhibit, please.
**22 A. (Witness complies.)**
23 Q.  Do you remember looking at this email exchange marked as
24    Exhibit 11?
**25 A. I do.**

Page 133

1 Q.  Okay.  Same question, to the extent it's unclear at this
2     point.  Did you construe any of these email communications
3     from Jon Anderson to be a threat of some kind against
4     Extension, that if you didn't take some adverse employment
5     action against Mr. Kleinjans or you didn't take a position
6     that they liked, with respect to a conflict of interest,
7     that you might not be approved or they might take some other
8     action against Extension in Ottawa County?
**9 A.  No, I did not feel any threat.**
10 Q. Okay.  Were concerns about office space or the MOU a factor
11    in any way, as you understand it, in terms of employment
12    decisions with respect to Mr. Kleinjans in May and June of
13    2024?
**14 A. No.**
15 Q.  Okay.  Although you've testified here today that it's
16    possible that the MOU, even after it was approved in January
17    of '24, with some notice it could have been terminated; is
18    that right?
**19 A.  That's correct.**
20 Q.  But again, concerns about funding through Ottawa County for
21    Extension, did that factor in any respect in terms of the
22    decision by Extension as to Mr. Kleinjans' employment?
**23 A. No.**
24 Q.  Okay.  Let me also ask this more broadly:  After it was
25    communicated to Joe Moss, Allison Miedema, and John Gibbs

Page 134

1  that Extension was not going to move Mr. Kleinjans out of
2  Ottawa County during his campaign in the spring of '24,
3  after you had that communication with him are you aware of
4  any threats or any efforts by anyone affiliated with
5  Ottawa Impact or Joe Moss to try to put pressure on MSU to
6  do something with respect to Mr. Kleinjans' employment?
7 A.  No.
8 Q.  Okay.  Did Extension leadership decide to let Mr. Kleinjans
9  run in the special election in the spring of '24 as part of
10  a campaign with the hope that he just wouldn't be elected,
11  therein alleviating any political concerns that Extension
12  may have had with the Ottawa County board, Ottawa Impact, or
13  Joe Moss?
14 A.  Not that I'm aware of.
15 Q.  Okay.  And so again, to the extent it isn't already clear,
16  were there ever any discussions that you were a party to or
17  that you were aware of wherein that sort of theory was
18  discussed: let him run, hope he loses, problem solved?
19 A.  No.
20 Q.  Matt Shane never said anything to you like that?
21 A.  No, that was -- that was not a hope, that Christian would
22  lose.
23 Q.  Okay.  And Erin Moore never said anything to you about that?
24 A.  No.
25 Q.  No one within Extension ever communicated that sort of a

Page 135

1  thought to you; is that right?
2 A.  Not with me.
3 Q.  Okay.  Mr. Korpak, I'm going to refer you to Exhibit 7 and
4  I'm also going to refer you, as part of these questions, to
5  Exhibit 1.  Do you have those exhibits?
6 A.  I do now, yes.
7 Q.  Okay.  Take a look at the first page of Exhibit 7.  It's
8  Bates stamped as MRD 43.  Do you see on the email from
9  James Kelly on December 18, to you and Matt Shane, there's a
10  comment that he makes there, he says I would not get drawn
11  into specific response to the social media post?  Did I read
12  that correctly?
13 A.  Yes.
14 Q.  Okay.  And that's in reference to some issue that Joe Moss
15  is raising for you and James Kelly about something that
16  Mr. Kleinjans has posted on social media, Facebook
17  specifically; is that right?
18 A.  That's correct.
19 Q.  Okay.  Now, look at Exhibit 1.  Similarly do you agree with
20  me that this email thread that's been marked as Exhibit 1,
21  not yet Bates stamped, starts with an email from Joe Moss on
22  December 15th?  Is that right?
23 A.  Yes.
24 Q.  And as an attachment to that he's referring to a Facebook
25  post from Mr. Kleinjans; is that right?

Page 136

1 A.  Yes.
2 Q.  And specifically he's sort of laying out various issues and
3  concerns he has with it, right?
4 A.  Correct.
5 Q.  And eventually he also, on December 28th, sends you a link
6  to a YouTube video that he doesn't think is appropriate.  Am
7  I sort of describing that all correctly?
8 A.  Yes.
9 Q.  Okay.  Did Extension leadership have any concerns at any
10  time about any specific Facebook post that Mr. Kleinjans was
11  making --
12 A.  No.
13 Q.  -- to your recollection?
14 A.  No.
15 Q.  Okay.  And also did Extension leadership have any concerns
16  about the fact that Christian appears in the YouTube video
17  that's referred to on page 2 of Exhibit 1?
18 A.  No.
19 Q.  Okay.  And in fact is it correct that on page 1 of Exhibit 1
20  there's an email from James Kelly dated December 28th?  And
21  I'm going to read a portion of the first paragraph of that
22  email.  He says, I watched the video also and thought it was
23  excellent.  I'm not sure that is what Joe wants to hear.
24  Certainly no concerns with Christian being in it.
25      Did I read that correctly?

Page 137

1 A.  Yes.
2 Q.  Okay.  So again, did MSU Extension ever take any action
3  against Christian or ever do anything with respect to his
4  employment because of that YouTube video or any Facebook
5  post that he posted?
6 A.  No.
7 Q.  Okay.  When Christian was ultimately separated from the
8  university in June of '24 was there ever any discussion
9  about emails from Joe Moss wherein he's raising concerns
10  about Mr. Kleinjans?
11 A.  No.
12 Q.  Okay.  Were these emails and the efforts by Joe Moss to get
13  Mr. Kleinjans moved out of Ottawa County during his campaign
14  discussed or considered as a factor with respect to
15  employment decisions for Mr. Kleinjans?
16      MR. LAMB:  Objection, foundation.
17 A.  No.
18 BY MR. DANIELS:
19 Q.  Okay.  But again, you've testified here today that as part
20  of your job you did see it as your responsibility to get the
21  MOA approved, right?
22 A.  Correct.
23 Q.  And you've also said that as part of your work it's
24  important that you maintain at least decent relationships
25  with local government where Extension functions; is that