**EXHIBIT 3**

Page 34
1 A. I believe Jessica Nakfour was working with legal counsel,
2    yeah.
3 Q. Okay. Was that a decision, about what would happen to
4    Chris's employment if he were elected to the county
5    commission, that you had any influence on? Were you able to
6    say, you know, I don't think that's what you should do if he
7    gets elected --
8 A. No.
9 Q. -- to the county commission?
10 A. I have no basis for expressing an opinion on that, not my
11    expertise, leaning on -- I'm very careful about
12    understanding my role and other's role. So, no, I have no
13    specific opinion other than thankful that the organization
14    had a policy that seemed to provide direction for the
15    situation.
16 Q. Okay. The policy that provided direction for the situation,
17    was that this policy on political activity by employees?
18 A. Yes. And again, there's the kind of formal name and there
19    were a few different policies. Obviously the first one we
20    looked at was more that political participation piece.
21 Q. Okay.
22 A. And then the -- I wrote it down because I just don't refer
23    to it -- but Incompatible Office Act, I believe.
24    And again, my understanding is that it was kind of
25    determined that there was both a conflict of interest in

Page 35
1    that role but also a question as to whether he could
2    actually fulfill the role of commissioner and complete the
3    requirements of his CNI role.
4 Q. Okay. Now, the Incompatible Offices Act, that is a Michigan
5    statute, correct?
6 A. Don't know.
7 Q. Okay. Do you remember, in the December 2023 meeting, when
8    you were in Australia participating virtually, was -- there
9    was no discussion of the Incompatible Offices Act with
10    Chris Kleinjans at that time, correct?
11    MR. DANIELS: Objection, form, foundation.
12 A. I couldn't say that with any confidence, no.
13 BY MS. HOWARD:
14 Q. Okay. You were also part of a meeting with Defendant Moss
15    and Commissioner Miedema in January 2024, correct?
16 A. Miedema wasn't there.
17 Q. Okay. Just Mr. Moss?
18 A. Moss and Korpak and I.
19    January 5th, is that the meeting you're referring
20    to?
21 Q. Yes.
22    During that meeting was there any discussion by
23    you or by Mr. Korpak telling Mr. Moss that if
24    Chris Kleinjans wins his election as county commissioner he
25    won't be able to keep his job at MSU Extension? Do you

Page 36
1    remember anything like that?
2 A. I don't know if that was -- I think I have meeting notes,
3    which you have.
4    No, so that's meeting notes of December 7th.
5    That's not -- do we have notes on that meeting?
6    So there was some pre-meeting conversation
7    regarding what should be expressed during that meeting.
8 Q. And who was part of that?
9 A. Matt Shane, and I believe Jessica Nakfour would have looked
10    over that, and Scott Korpak.
11 Q. Okay. And what was discussed with that group about what
12    should be talked about in the January 2024 meeting?
13 A. It was really a response to Joe Moss's request. Do I
14    have -- so at some point, I believe while I was in
15    Australia, there was -- there may have been a written
16    request, or perhaps it was an overflow from the meeting, but
17    for Christian to be reassigned. I don't know that we can
18    define that, but -- so this was our chance, again, to kind
19    of respond to his desires by sharing what we had done in
20    terms of research in terms of what Christian's rights were,
21    and within our organization how that fits.
22    So that's where we presented the Guidelines For
23    Participation in Political Activities from the Michigan
24    Campaign Finance Act and shared that, you know, we
25    understood that it didn't meet his expectations or his

Page 37
1    desires but we, again, had done our research and that's our
2    stance, once again confirm that we weren't going to limit
3    Christian's ability to campaign, that we've done our
4    research, that's what our policy allowed, that we had
5    reviewed the social media posts, and again that they've come
6    from a private account with no affiliation with
7    MSU Extension.
8    So although they might be interpreted as
9    inflammatory, that's Christian's time and his personal
10    place.
11 Q. You're referring to a document to refresh your recollection;
12    is that correct?
13 A. I'm referring to a document. I'm referring to the official
14    document that we provided Joe Moss kind of in response to
15    that, which I then reviewed with him.
16 Q. Okay. So this is the memo dated January 5, 2024 --
17 A. Yes.
18 Q. -- to Mr. Moss, and the official author of that was
19    Mr. Shane?
20 A. Correct.
21 Q. Okay. And this memo was presented to Mr. Moss and you went
22    over it?
23 A. I was the -- kind of the voice behind it and delivering that
24    and just responding to any questions.
25 Q. Okay. There's nothing in that memo that reflects any

Page 38
1  discussion about what's going to happen with Mr. Kleinjans'
2  employment if he wins the election, is there?
3  A.  I don't believe so.
4  Q.  And do you recall ever having a discussion like that with
5  anyone from Ottawa County, Mr. Moss or anybody else, about
6  if Mr. Kleinjans is elected to the Ottawa County commission
7  what's going to happen with his MSU Extension employment?
8  A.  Not outside of the leadership group that was kind of working
9  through this issue, because it's a personnel matter and we
10  know that we need to keep that private.
11 Q.  Okay. I'm going to show you an exhibit that we marked in
12  Mr. Korpak's deposition again. I'm not sure if you've seen
13  it before, but it was a document produced by Ottawa County
14  in this case or Mr. Moss, Defendant Moss. It's Exhibit 10
15  to Mr. Korpak's deposition. It's Bates stamped Defendant
16  Moss 13 through 15.
17       So if you look at Exhibit 10 -- I'll show this to
18  you. So the very top email is what I'm getting at. First
19  question: Have you ever seen this document before?
20 A.  The entire chain? I would have to read through. Unless I'm
21  named in it, no.
22 Q.  Well, at least the top email.
23 A.  No, I don't believe so.
24 Q.  Okay. In there you'll see an email from Mr. Moss, and it --
25  if you look at paragraph 2, the email says, on a side note

Page 39
1  Commissioner Miedema and I were told by the directors of
2  MSU Extension, who had conferred with their corporate
3  counsel, that it was forbidden for an elected commissioner
4  in Ottawa County to also be employed by MSU Extension and
5  that they would have to separate if Christian was elected.
6       I'm just trying to drill down on, if that
7  conversation occurred, who had it with Mr. Moss, and
8  wondered if you had anything you could offer on information
9  on that.
10 A.  I don't. Given that was -- that response was May 28, and as
11  I said my involvement with most of that piece really kind of
12  settled down around January 4th, with the passing of the
13  MOA, that leaves four months of other conversations that I
14  wasn't really part of in terms of action on Christian's
15  situation.
16 Q.  Okay. And you just testified you would expect that
17  personnel decision information probably would have remained
18  private and not have been shared?
19 A.  That would have been my expectation, yeah.
20       MS. HOWARD: Okay. Let's take like a 10-minute
21  break, if that's okay. It's 4:00 now; we'll come back at
22  4:10.
23       (Recess taken from 4:00 p.m. to 4:12 p.m.)
24       MS. HOWARD: We are back on the record.
25       Mr. Daniels, do you want to summarize the

Page 40
1  discussion we just had for the record?
2       MR. DANIELS: Sure. Mr. Kelly, as I understand,
3  has a document that contains some dates and notes prepared
4  for use in the deposition today. It hasn't otherwise been
5  produced by the MSU defendants in discovery. Upon maybe one
6  more quick review from our office I'd anticipate that we'll
7  produce it as a supplemental production in the case.
8       MR. LAMB: That's fine, absolutely.
9       MS. HOWARD: Okay. Thank you, Mr. Lamb.
10 BY MS. HOWARD:
11 Q.  Mr. Kelly, did you talk to Erin Moore at any point, when you
12  were acting as the interim before Mr. Korpak took over,
13  about Chris Kleinjans' conversations with Erin Moore about
14  his involvement in the recall or his plan to potentially be
15  the candidate if a recall was certified?
16 A.  I need you to repeat the first part of that again.
17 Q.  Sure. Did Erin Moore ever tell you that she had had any
18  discussions with Mr. Kleinjans around November 2023 or
19  perhaps earlier about his intention to potentially run for
20  office?
21 A.  Around November, '23? I don't have a specific recollection
22  of that. In fact I don't know that I could pinpoint the day
23  that I learned, in fact, when Christian disclosed himself,
24  when he was running, and I think maybe it was through an
25  interaction with Joe Moss, that -- that, do you know that

Page 41
1  he's politically active in the county, and I said, no. I
2  didn't really know what that meant.
3       So again, I think I was late to knowing that he
4  was a potential candidate.
5 Q.  Okay. As we sit here today, though, you don't have any
6  specific recall about discussing this with Erin Moore early
7  on?
8 A.  No.
9 Q.  Okay. Did you ever meet with interim Ottawa County
10  administrator Jon Anderson?
11 A.  No.
12 Q.  Did you ever talk directly to county administrator
13  John Gibbs?
14 A.  Yes.
15 Q.  Okay. Tell me about those conversations that you had with
16  Mr. Gibbs.
17 A.  Pretty brief. The first one was I have a memory of going to
18  a department head meeting when he first started, I don't
19  know when that would have been even, but -- so I think it
20  might have been his first department head meeting and I just
21  wanted -- and I went to basically introduce myself. And
22  that's the extent. It was a one-minute conversation before
23  a larger meeting.
24       And then the other pieces of -- the only other
25  communications were just -- again, I don't remember if it