CORRECTED

**EXHIBIT 4**

Page 94

1  didn't think he could do both county commissioner
2  and serve in his role as CNI.
3 Q  (MS. HOWARD) Okay.  If you told Joe Moss that he
4    would -- you would have to look at options for
5    that, did you leave open with Joe Moss the
6    possibility that he might in some capacity still be
7    working for Extension while he was an Ottawa County
8    commissioner?
9 A  I don't know specifically what was said in that.
10 Q  Okay.
11 A  I did not communicate anything with Joe Moss.
12 Q  Okay.  All right.  But was it your understanding
13    that Korpak and Kelly communicated with Joe Moss
14    that it was still possible that MSU Extension would
15    employ Chris if he was elected as a county
16    commissioner?
17       MR. DANIELS:  Objection. Form,
18    foundation.
19       MR. LAMB:  Same objection.
20       THE WITNESS:  I don't -- I don't know
21    that that was specifically stated or not stated.  I
22    don't know.
23 Q  (MS. HOWARD) Okay.  Well, when you look at Scott's
24    email here, Scott -- the last phrase of what Scott
25    says is "what we shared is that we did not think he

Page 95

1    could fulfill his role."
2 A  I think that was in relation to the discussion that
3    was had with -- between Commissioners Miedema and
4    Moss and Directors Kelly and Korpak back in
5    December of saying we need to -- we don't know.  We
6    think this isn't going -- he isn't going to be
7    compatible, we have to talk to Extension leadership
8    to give you an answer.  And then we provided the
9    written answer after that in January.
10 Q  You'll agree with me, though, in none of the
11    written notes of these conversations or the emails
12    with Commissioner Moss and Miedema does it say
13    anything about what's going to happen if Chris
14    Kleinjans wins the seat; right?
15 A  Right. Yes.  I don't see anything in writing.
16    That's why I don't know what was specifically said.
17 Q  Okay.  Why would that have been an issue that
18    Korpak and Kelly would have -- I'm sorry, I don't
19    mean to be disrespectful, but it's cumbersome to
20    say "Mr." every time.
21 A  No, that's fine.
22 Q  Why would Korpak and Kelly have discussed that with
23    Joe Moss before Chris was elected?
24 A  I don't know.
25 Q  Okay.  Did you ever advise them you thought they

Page 96

1    should loop Joe Moss in on that?
2 A  Not that I recall, no.
3 Q  Okay.  Do you have any concerns about the fact that
4    Korpak and Kelly said something to Joe Moss and/or
5    Jon Anderson about what would happen with Chris's
6    employment?
7       MR. DANIELS:  Objection. Form,
8    foundation.
9       MR. LAMB:  Same.
10       THE WITNESS:  Not necessarily, because I
11    don't know what was said.
12 Q  (MS. HOWARD) Generally would you consider it
13    appropriate for district directors to discuss with
14    a third party what might happen with the employment
15    of one of your employees?
16       MR. LAMB:  I'm just going to place an
17    objection to form, foundation.
18       THE WITNESS:  If it's -- employee
19    relation conversations are not appropriate to be
20    shared outside of our -- outside of Extension, but
21    I don't know that this -- that was the context of
22    that conversation.
23 Q  (MS. HOWARD) Okay.  And then if you look at MRD
24    134, same thing here.  The vast majority of these
25    communications are redacted, and same on to 135.

Page 97

1    Would you agree?
2 A  I would agree.
3 Q  Okay.  Earlier today when Erin Moore was deposed
4    she told us about a meeting that MSU Extension
5    leadership had on Mackinac Island in May of 2024
6    shortly before you and others met with Chris
7    Kleinjans to tell him what you decided his options
8    for his job were.
9       Did you attend that Mackinac Island
10    meeting?
11 A  I did.
12 Q  Okay.  What did the MSU Extension leadership group
13    in that meeting discuss about what you were going
14    to tell Chris Kleinjans when you met with him
15    later?
16 A  To the best of my memory of that meeting, we talked
17    about the option, again, because we didn't feel --
18    there was a conflict of interest, and that those
19    roles could not be compatibly done together, that
20    we saw that there were two options.  One, that
21    there would be a termination of employment if he
22    didn't step down from his role, or because this
23    special election was viewed as an interim role,
24    that we would be willing to grant an unpaid leave
25    of absence during his tenure as an interim

Page 98

1 commissioner until the election results were known
2 in November through the end of the calendar year so
3 that if he was not elected in November, he could
4 return to his position.
5     But, again, we weren't going to release
6 him. We weren't going to allow, because of the
7 conflicts we've stated, for him to serve in both
8 capacities. So we actually recommended an option
9 of an unpaid leave during this interim role of
10 employment so that he didn't have to go as far as
11 losing his position in what essentially amounts to
12 a short-term interim position, because we can grant
13 unpaid leaves of absence for up to two years.
14 Q Okay. But you weren't offering him an unpaid leave
15 for up to two years, you were telling him if he
16 runs in November he's out?
17 A Correct.
18 Q Why did you decide that?
19 A Because the annual -- because the new election
20 laws, the changes for county commissioners is a
21 four-year board term.
22 Q Right.
23 A So we decided that if he was elected to a four-year
24 board term that we weren't intending to extend the
25 option for an unpaid leave of absence if he were

Page 99

1 elected to a four-year position on the board.
2 Q Okay.
3 A There wouldn't be any viable reason necessarily to
4 extend that unpaid leave once that -- once he took
5 office officially for four years because it
6 wouldn't complete his term anyway.
7 Q Or at least viable options as far as Extension was
8 concerned?
9 A Correct.
10 Q Okay. So was there discussion on Mackinac Island
11 that Chris could serve as a county commissioner and
12 still work for Extension in some capacity?
13 A I don't believe so.
14 Q Okay. Was there any discussion on Mackinac Island
15 when the group met about whether or not it was a
16 problem that Chris would be on an unpaid leave of
17 absence and still technically an MSU employee if
18 being an employee was a conflict of interest or
19 violated the Incompatible Offices Act?
20 A I don't recall that that was part of the
21 conversation.
22 Q Because technically he still has a connection to
23 Extension. He still has an employment relationship
24 with Extension even if it's on an unpaid leave.
25     You would agree with that; right?

Page 100

1 A Sure.
2 Q So that doesn't necessarily solve the problem that
3 the group stated and why they were doing this?
4 A Right. Which is why that was -- that was us
5 recommending that to general counsel and Academic
6 HR as a possible option, because we were trying to
7 extend an olive branch, so to speak, that this is
8 an interim position, and we were willing to -- we
9 were willing to grant an unpaid leave during that
10 interim time.
11     There still would have to be stipulations
12 about that conflict piece that probably wouldn't
13 get completely resolved. We had concerns about
14 that. But, again, no one's questioned Christian's
15 employment record with us.
16     We weren't -- we weren't wanting him to
17 leave the organization. So that was why we
18 suggested it as a viable alternative for that
19 six-month or seven-month period of time.
20 Q Okay. Now, a couple of times in our discussion
21 here the past few minutes you've referred to it as
22 an interim commissioner role, and I know what
23 you're saying, that it was -- the rest of the term
24 was from May when the recall election happened
25 until the end of 2024, and there would be a general

Page 101

1 election in November to determine he would serve
2 starting in January of 2025; correct?
3 A Correct.
4 Q But, in fact, he was -- there is no such role as an
5 interim commissioner. He was a full-blown county
6 commissioner after May; right?
7 A I understand, yes.
8 Q Okay. Was there any discussion on Mackinac Island
9 that Chris being on an unpaid leave, even if he was
10 still technically an employee on the books for MSU
11 Extension, so to speak, might take some of the
12 pressure off of MSU Extension with respect to Joe
13 Moss and the Ottawa Impact majority of the
14 commission?
15 A No.
16 Q Okay. If it wasn't stated exclusively, was there
17 any implicit feeling among the group about that
18 point?
19 A I don't believe so, no.
20 Q Okay. Did you feel that, that that might appease
21 the Ottawa Impact majority for a while if Chris was
22 at least on unpaid leave?
23 A No, not directly. I -- the MOA had been approved
24 by that point in January, and we hadn't had any
25 follow-up or any further conversations with anyone

Page 142

1  A   Yes.
2  Q   Do you construe that to refer to what was
3      communicated to Christian, Mr. Kleinjans, in the
4      December 5th, 2023, meeting?
5  A   Yes.
6  Q   Okay. After this email was sent, did anybody that
7      was copied here or anybody receive it say what are
8      you talking about, Scott, or did anybody suggest
9      that they didn't know that that's what was
10     communicated to him or that that's in some way
11     inaccurate?
12 A   Not to my knowledge, no.
13 Q   Okay. Do you believe there's other written
14     documentation or emails that are similar to that
15     that have been produced in this case that are also
16     in line with that statement from Mr. Korpak that
17     would suggest that, at least within leadership, all
18     the defendants to this case believed that Christian
19     had been told on December 5th that should he be
20     elected to the commission, he would not be able to
21     continue to serve as a CNI?
22 A   I believe so, yes.
23 Q   Okay. Your testimony today is that you really
24     weren't involved in processing any grievances filed
25     with Christian after his separation from the

Page 143

1      university; is that right?
2  A   Correct.
3  Q   Do you believe that any grievance that Christian
4      filed was denied or ignored on technical grounds?
5          MS. HOWARD: Objection. Lack of
6      foundation.
7          THE WITNESS: Not to my knowledge.
8  Q   (MR. DANIELS) Okay. So, for example, have you seen
9      some emails in this case that refer to the fact
10     that an email that Christian sent to Stephanie
11     Marino in connection with this grievance went to
12     her junk folder?
13 A   Yes.
14 Q   Was Christian's grievance at that stage denied
15     because it wasn't timely or because Stephanie
16     Marino didn't receive it in time, if you know?
17 A   I don't believe so.
18 Q   Okay. Did you construe anything that Jon Anderson
19     ever did, the former county administrator for
20     Ottawa County, at any time as meant to be a threat
21     towards Extension if they did not terminate or take
22     some adverse employment action against
23     Mr. Kleinjans?
24 A   No.
25 Q   Okay. That relates to any emails he sent?

Page 144

1  A   Correct.
2  Q   That also relates to the alleged visit that he made
3      to Ottawa County offices in May of 2024?
4  A   Yes.
5  Q   Mr. Korpak, is it correct that Extension has
6      memorandums of understanding with approximately 83
7      counties?
8          MS. HOWARD: Mr. Daniels, I think you
9      meant Mr. Shane?
10         MR. DANIELS: Did I say Mr. Korpak?
11         MS. HOWARD: You did. Uh-huh.
12         MR. DANIELS: My apologies. He doesn't
13     even work at Extension anymore.
14 Q   (MR. DANIELS) Mr. Shane, is it correct that
15     Extension has MOAs with approximately 83 counties
16     in the state?
17 A   We don't have them with all counties, but yes, we
18     have 80 agreements.
19 Q   80?
20 A   Yes.
21 Q   And are most of those approved on an annual basis?
22 A   Most, yes.
23 Q   Okay. So you testified earlier that approval of
24     the MOA in Ottawa County after Mr. Kleinjans was
25     elected to the commission seat, approval of that

Page 145

1      MOA I think you said was on your radar; is that
2      correct?
3  A   For the coming fiscal year, yes.
4  Q   For the upcoming fiscal year?
5  A   Yes.
6  Q   Or that it was sort of viewed as a watch county; is
7      that right?
8  A   Yes.
9  Q   Okay. But basically in every county the extension
10     has an interest in monitoring and getting
11     memorandums of understanding approved; correct?
12 A   Yes. That's the primary responsibility of a
13     district director, yes.
14 Q   Okay. Was that concern related to continued
15     approval of the MOA in Ottawa County after
16     Mr. Kleinjans was elected to the Ottawa County
17     board seat, was that a consideration that factored
18     into the decision to offer him leave followed by
19     potentially separation, those concerns over the MOA
20     approval factor into the decision with respect to
21     his position with the university in any way?
22 A   No.
23 Q   Okay. Do you remember you signing an affidavit as
24     part of the preliminary injunction hearing in this
25     case?

Page 146

1  A   Yes.
2  Q   In that affidavit did you set forth the reasons for
3      believing that Mr. Kleinjans could not serve as a
4      CNI and an Ottawa County board member?
5  A   Yes.
6  Q   Has the testimony provided in that affidavit
7      changed in any way since you signed it?
8  A   No.
9  Q   Okay.
10          (Deposition Exhibit 14
11          was marked for identification.)
12 Q   (MR. DANIELS) I'm going to hand you what's been
13     marked as Exhibit 14.  Do you recognize what I've
14     handed to you, Mr. Shane?
15 A   Yes.
16 Q   Okay.  What is this?
17 A   The first page is a -- the financial summary
18     statement and staffing declarations of the fiscal
19     year '25 MOA, the one that was approved late in
20     '24, and the second page is our July '23 to June of
21     2024 overall Extension budget with a different
22     breakdown of funding from our variety of sources.
23 Q   Okay.  Do you see that these have been marked as
24     Bates Number MRD 499 and MRD 500?
25 A   Yes.

Page 147

1  Q   Okay.  So, Mr. Shane, what's been marked as Exhibit
2      14, the number in bold on the bottom right on the
3      first page, $280,749, does that represent in
4      dollars the value of the memorandum of
5      understanding for the current year in Ottawa
6      County?
7  A   Yes.  Those are the funds that the county would
8      send to MSU as payments.  It does not include
9      things like space or office support that's provided
10     by the county as county employees.
11 Q   Okay.  So that number's actually a little bit more
12     than what's provided for there?
13 A   Overall value, yes.
14 Q   Okay.  I mean, can you quantify how much more?  And
15     if not, that's fine.
16 A   Not off the top of my head, no.
17 Q   Okay.  You agree with me though that in terms of
18     round numbers, the value of MOA to Ottawa County
19     Extension is in the 3- to $350,000 range?
20 A   Yes.
21 Q   Okay.  Go ahead and turn to the next page, MRD 500.
22     Tell me what this chart provides for here.
23 A   So this is the breakdown of the variety of funding
24     sources that fund Extension's roughly $107 million
25     budget of which the county portion, county funding

Page 148

1      portion, statewide is 15.3 million.
2  Q   Okay.  So county investments are provided for on
3      the left there; is that right?
4  A   Yes.
5  Q   And that's in excess of $15 million?
6  A   Correct.
7  Q   Okay.  So what Ottawa County provides for is
8      included in that number?
9  A   Yes.
10 Q   It is a fraction of the overall budget for
11     Extension; is that right?
12 A   Yes.
13 Q   And then the number at the top for MSU Extension
14     total revenue, it's referred to revenue there but
15     is essentially that $106 million number the total
16     budget for Extension 2023-2024 fiscal year?
17 A   Yes.
18 Q   Okay.  So, again, we've talked a lot about the fact
19     that approval of the MOA in Ottawa County was
20     important to Extension; correct?
21 A   Yes.
22 Q   Had it not been approved, there would have been
23     some repercussions; correct?
24 A   Yes.
25 Q   But is it your belief that Extension would have

Page 149

1      continued to exist in Ottawa County even without
2      the MOU?
3  A   Depending on the relationship, yes.  We have to --
4      we assess those on a case-by-case basis as to what
5      the relationship is and what level of service we're
6      still able to provide.
7  Q   Okay.  And moreover, in terms of how that might
8      impact Extension more broadly across the state,
9      essentially it's a negligible sum of money.  No?
10 A   Financially, yes.
11 Q   Okay.  You testified earlier that with respect to
12     approval of the MOA in Ottawa County you and I
13     think Scott Korpak and James Kelly had an interest
14     in wanting to, your words, pave the way towards
15     approval of the MOA; is that right?
16 A   Yes.
17 Q   And you guys accomplished that by trying to
18     continue to cultivate good relationships with the
19     Ottawa County board; is that right?
20 A   Yes.
21 Q   Would you have terminated or taken any adverse
22     employment action against Christian Kleinjans in an
23     effort to maintain or cultivate that good
24     relationship?
25 A   No.

Page 150

1  Q   Okay. Did your desire to get the MOA approved or
2      maintain a good working relationship with the
3      Ottawa County board, Joe Moss, Ottawa Impact
4      members or otherwise inform your decision with
5      respect to Christian in this case?
6  A   No.
7  Q   After you sent your letter to Joe Moss and John
8      Gibbs on January 25th of 2024 wherein you said you
9      would not move Christian out of Ottawa County, are
10     you aware of any pressure or any efforts by Joe
11     Moss, Ottawa Impact, or anyone else to try to get
12     Extension to do anything to retaliate or take some
13     adverse employment action against Mr. Kleinjans?
14 A   No.
15 Q   And again, just so it's clear, the reasons for
16     offering Mr. Kleinjans leave followed by
17     potentially separation were not motivated by any
18     pressure by Ottawa Impact or anyone else; is that
19     right?
20 A   Yes.
21         MS. HOWARD: Objection. Asked and
22     answered.
23         MR. DANIELS: I don't have anything
24     further.
25         MS. HOWARD: I have some follow-up

Page 151

1      questions, Mr. Shane.
2              FURTHER EXAMINATION
3  BY MS. HOWARD:
4  Q   Mr. Daniels just asked you a series of questions
5      about what motivated the decision in terms of
6      Mr. Kleinjans' employment. Those decisions were
7      actually informed by what general counsel said you
8      needed to do; correct?
9  A   Yes.
10 Q   Okay. And by what HR in consultation with general
11     counsel said you could do?
12 A   Yes.
13 Q   So if general counsel had said the law permits
14     Chris to keep working as an MSU Extension employee
15     and be a county commissioner at the same time, that
16     would have informed the decision, right, if that
17     had been what general counsel said?
18         MR. DANIELS: Objection. Form,
19     foundation.
20         THE WITNESS: Yeah, we take their
21     guidance.
22 Q   (MS. HOWARD) Okay. And so your decision was
23     dependent on what general counsel advised you; is
24     that right?
25 A   Yes.

Page 152

1  Q   Okay. I want to ask you -- you remember you and I
2      talked -- I'm making it sound like conversation --
3      you were on the stand, I was asking you questions
4      about the importance of Ottawa County to MSU
5      Extension. Do you remember that?
6  A   I do.
7  Q   Okay. And you would still agree with me that
8      Ottawa County is an important agricultural county
9      in Michigan; right?
10 A   Yes.
11 Q   It is the fastest-growing county in the state;
12     correct?
13 A   I'm not familiar with those statistics, but sure.
14 Q   Okay. And it's the seventh largest county; right?
15 A   I believe so.
16 Q   Okay. And it also has the most agricultural
17     business of any county in the state; is that right?
18 A   That's my understanding, yes.
19 Q   Okay. And also there has been some concern among
20     MSU Extension officials and others, hasn't there
21     been, that Ottawa Impact commissioners and
22     political beliefs like those might seep into Kent
23     County or other places that MSU Extension serves?
24     Are you aware of that?
25         MR. LAMB: Objection. Form, foundation.

Page 153

1          THE WITNESS: I've not -- I've not heard
2      that.
3  Q   (MS. HOWARD) Okay. That's all right, I will cover
4      that with Scott Korpak.
5          Mr. Lamb asked you -- marked Exhibit 12
6      which is this memo from James Kelly in November of
7      2023.
8  A   Yes.
9  Q   And he sent that to the Ottawa County Administrator
10     and Ottawa County Board of Commissioners.
11         Do you see where I'm looking?
12 A   Yes.
13 Q   That's what it says in the to line; right?
14 A   Yes.
15 Q   In fact, this only went to Joe Moss and John Gibbs;
16     correct?
17 A   I -- that I don't know.
18 Q   Okay. So James Kelly's probably the best person to
19     ask of that?
20 A   I would say so, yes.
21 Q   Okay. And if you look at the end of this memo,
22     Mr. Kleinjans -- there is nothing that MSU
23     Extension determined that Mr. Kleinjans said that
24     was untrue or false or misleading; right?
25 A   As far as I know, that's correct.