UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTIAN KLEINJANS,

     Plaintiff,

                                       Case No. 1:24-cv-643

v.

                                       Hon. Hala Y. Jarbou

M. SCOTT KORPAK, et al.,

     Defendants.

_____/

**OPINION**

Plaintiff Christian Kleinjans brings this lawsuit under 42 U.S.C. § 1983 against three Michigan State University officials, alleging that Defendants violated the First Amendment by terminating his employment because he ran for local public office.  Before the Court are Defendants' motion for summary judgment (ECF No. 93) and Kleinjans's cross-motion for partial summary judgment (ECF No. 96).  For the reasons explained below, the Court will grant summary judgment to Defendants and dismiss the case.

**I. BACKGROUND**

Kleinjans is a former employee of Michigan State University Extension (MSUE), a branch of Michigan State University (MSU) that provides community-based education throughout the state.  Plaintiff was a community nutrition instructor for MSUE in Ottawa County.  (Kleinjans Dep. 28–29, ECF No. 95-1.)  Ottawa County partially funds MSUE's local operations and provides office space for the organization.  (PI Hr'g Tr. 14, ECF No. 30.)  In order for MSUE to receive these funds, the Ottawa County Board of Commissioners must approve a memorandum of agreement (MOA) each year.  (*See* Korpak Dep. 22, ECF No. 97-2.)[1]  Before 2023, the approval

---

[1] Additional excerpts of this deposition are available at ECF No. 95-3.

process was generally "perfunctory." (*Id.* at 23.)  But in 2023, Commissioner Joe Moss—Chair of the Board of County Commissioners, and formerly a defendant in this case—held up the approval process.  Consideration of the MOA was initially on the Commission's agenda for its meeting on November 21, 2023.  (Gibbs Decl. ¶ 4, ECF No. 97-4.)  According to then-County Administrator John Gibbs, the Board of Commissioners Finance Committee had approved the MOA "without much, if any, discussion," and passage by the Board "was expected to be non-controversial."  (*Id.*)  But the approval process hit a snag when Moss directed Gibbs to postpone the Board's consideration of the MOA.  (*Id.* ¶ 5.)

Some background is necessary to understand Moss's decision.  The Board had recently passed a budget that stirred up significant controversy because it reduced funding for the County's Health Department.  (PI Hr'g Tr. 16.)  Opponents of the budget cuts argued that there would not be enough funding for the Health Department to maintain a coordinator to work with Ottawa Food, an organization that addressed local food insecurity.  (Gibbs Decl. ¶ 2.)  Kleinjans was a member of Ottawa Food's Advisory Board, and he took a strong public position against the budget cuts. (*Id.* ¶ 2.)  The issue was prominently featured in the local news (*id.* ¶ 3), and Kleinjans gave several interviews about it (PI Hr'g Tr. 20).  MSUE later told Kleinjans that it was inappropriate for him to publicly comment on a political matter in his capacity as an MSUE employee (rather than as a private individual), although it did not take further disciplinary action.  (Kelly Dep. 19–21, ECF No. 108-2.)[2]

Moss apparently did not appreciate Kleinjans's criticism of the Board.  When Moss told Gibbs to postpone the Board's consideration of the MOA, he also told Gibbs to convey to James Kelly—an administrator at MSUE—that Moss and fellow Commissioner Allison Miedema "were

---

[2] Excerpts of this deposition are also available at ECF No. 97-3.

very unhappy that Mr. Kleinjans, Kelly's employee, was making public statements about Ottawa Food with which Moss and Miedema disagreed."  (Gibbs Decl. ¶ 5.)  According to Gibbs, "Moss and Miedema decided to hold up the MOA indefinitely to leverage MSU[E] into moving Mr. Kleinjans out of its Ottawa County operations."  (*Id.*)  Pursuant to this goal, "Moss and Miedema instructed [Gibbs] to advise MSU[E] that the MOA was being help up indefinitely."  (*Id.*)  On November 17, Gibbs passed on Moss and Miedema's message to Kelly and indicated he "did not know when Moss would put the MOA back on the full Board agenda."  (*Id.* ¶ 6.)  Kelly told Defendant M. Scott Korpak, the regional District Director at MSUE, that Kelly's "theory" as to why the funding was being held up was that Moss and Miedema disliked Kleinjans's recent television interview about the Ottawa Foods controversy.  (*See* Korpak Dep. 41.)

Kelly and Korpak attended a County Board meeting on November 21, 2023, and spoke to Moss privately afterward.  (*See id.* at 37–38.)  According to Korpak, Moss told him that Kleinjans "was spreading falsehoods and . . . [Moss] was not happy with it and felt that it was not allowable for an MSU[E] employee to be involved in the things that Mr. Kleinjans was doing."  (*Id.* at 39.)  In particular, Moss expressed concerns about Kleinjans's social media activity.  (*Id.*)  Korpak responded that MSUE would "follow the rules" and "look into if there's any concerns that . . . are true."  (*Id.* at 40.)

Around the same time, a group in Ottawa County was working to recall one of Moss's political allies on the Board, Commissioner Lucy Ebel.  Kleinjans was part of the recall effort, and in July of 2023 he had mentioned to Defendant Erin Moore, his supervisor, that he might run for Ebel's seat on the Commission.  (PI Hr'g Tr. 8, 10.)  On November 27, 2023, the County Clerk certified that the recall effort had gathered enough signatures to hold an election in May 2024.  The same day, Kleinjans told Moore that he was going to run as the Democratic nominee to replace

Ebel.  Kleinjans suggested that he would wait to publicly announce his candidacy until the MOA was approved, so that his candidacy would not affect the MOA.  (*Id.* at 26.)  But Moore responded that the Board could still revoke the MOA after approval.  (*Id.*)  She also expressed concern to Kleinjans that the Board might react negatively to his candidacy because the commissioners were "vindictive" and "don't have a problem going after . . . people in organizations that they perceive as enemies."  (*Id.* at 27.)  Moore told Kleinjans that there was "no rule against" him running for commissioner, but added "that there is [a] conflict of interest" and that being a commissioner would "impede [Kleinjans's] ability to serve" in his current job "based on timing alone."  (11/27/2023 Unofficial Tr., ECF No. 17-2, PageID.135.)  She also suggested that if he became a commissioner he would have to abstain from voting on MSUE's funding.  (*Id.*, PageID.139.)  But ultimately she assured Kleinjans that MSUE would "respect [his] decision" about running.  (*Id.*)

Before he chose to run for office, Kleinjans consulted the MSUE Administrative Handbook to determine whether he was allowed to be a political candidate.  (PI Hr'g Tr. 11.)  The handbook provides in relevant part:

- Being a partisan candidate may entail the assumption of political positions that could, potentially, pose conflicts with an individual's role in MSU Extension.
  . . . .
- The employee must keep administrative superiors closely advised regarding any sources of actual or reasonably anticipated conflicting interests. The employee is responsible for avoiding conflicts of interest and failings in this regard that may give rise to prospective discipline.
  . . . .
- If an MSU Extension employee is elected to political office, the demands, expectations and prospective conflicting interests may be such that the employee will have to take an unpaid personal leave of absence during the term of office.
- An MSU Extension employee considering political activity must timely disclose such prospective activity to their institute director as well as the Director of HR for MSU Extension, so that there is an opportunity to identify and discuss points of concern or sensitivity.

(Handbook Excerpt, ECF No. 95-25, PageID.1433.)  Kleinjans concluded that running for commissioner did not implicate the handbook provisions because it was a part-time job and so would not create the same time conflicts as a full-time political position.  (PI Hr'g Tr. 11–12.)

On December 5, Kleinjans met with Moore, Korpak, and Defendant Matthew Shane—the associate director of field services for MSUE—to discuss his candidacy.  Kleinjans recalled that the "meeting was primarily focused on how [he] was to . . . comport [him]self during the campaign to keep space between MSU[E] and the campaign itself."  (Kleinjans Dep. 52.)  According to Shane, one of the issues they discussed in the meeting was MSUE "not being willing to provide [Kleinjans] the ability to do both roles"—that is, to be both a commissioner and an MSUE employee.  (Shane Dep. 42, ECF No. 95-2.)  Shane explained that "the amount of time that we felt it was going to take as a county commissioner" would be "directly in conflict . . . with [Kleinjans's] role as a community nutrition instructor."  (*Id.*)  Shane also indicated that MSUE "felt there was a conflict of interest" with Kleinjans being both a commissioner and an MSUE employee.  (*Id.* at 43.)  Korpak similarly testified that based on the MSUE handbook, he felt "that it would be a conflict of interest to do both" roles.  (Korpak Dep. 79.)  According to Korpak, in the December 5 meeting he told Kleinjans that MSUE legal counsel had said Korpak could not serve in both roles.  (PI Hr'g Tr. 101.)  Moore testified that she told Kleinjans in the meeting that if he was elected, MSUE did not "see a way forward" for him "to continue in a 40-hour-a-week job and be a county commissioner."  (Moore Dep. 57, ECF No. 95-4.)  The winner of the recall election would only serve a partial term, as there would be another election in November of 2024, so Kleinjans raised the possibility of him taking a leave of absence between May and November while he served the partial term until he found out if he would be serving a full term.  (Shane Dep. 43.)  Shane replied that he was unsure about that and would have to check with the human resources department.  (*Id.*)

5

Korpak testified that "[i]t was clearly communicated" to Kleinjans that he would have to give up his MSUE job to be a commissioner, and Kleinjans responded that "we'll just worry about that if we have to cross that bridge."  (PI Hr'g Tr. 111–12.)

Kleinjans disputes Defendants' characterization of the December 5 meeting.  He testified that there was no "discussion about what was anticipated or what would happen with [his] role if [he] were elected to a county commissioner seat" (*id.* at 68–69), and that "Moore [did not] tell [him he] would be fired from MSU[E] or need to lose [his] job if [he] won a seat on the county commission" (*id.* at 35–36).  However, he agreed that Defendants discussed "what [he] can and cannot do as an [MSUE] employee while participating in political activities," and how to avoid "mingl[ing] the two."  (*Id.* at 68.)

On December 6, 2023, Kleinjans publicly announced his candidacy in the recall election. The following day, Kelly and Korpak met with Moss and Miedema to discuss the MSUE program. During the meeting, Korpak raised the issue of the MOA.  (*Id.* at 87.)  According to Korpak, Moss and Miedema did not "specifically" say that they were holding up the MOA because of Kleinjans, but they made a "veiled threat" by expressing "concern" about "Kleinjans'[s] involvement in the recall process."  (*Id.*)  Korpak understood from the conversation that Moss and Miedema did not like that Kleinjans was running against their political ally, "specifically because they did not believe that an employee, as they saw it, of a department that was part of Ottawa County could both do that position and run as a candidate."  (*Id.* at 87–88.)  Korpak responded that Kleinjans was not a county employee.  (*Id.* at 88.)  Moss and Miedema "mentioned several possibilities that might be able to help the [MOA approval] process along," such as transferring Kleinjans to another county.  (*Id.* at 89.)  They also "mentioned that the space that MSU[E] had was a desirable space

and that they had another department or other departments that were growing," which Korpak interpreted as a threat to take away MSUE's free office space. (*Id.* at 89–90.)

Korpak understood that Moss and Miedema were unhappy with Kleinjans's political activity, but he and Kelly "did not [make] any concession to what [Moss and Miedema] wanted [MSUE] to do" and "saw it as an unfortunate and an improper meeting." (*Id.* at 90.) Korpak told Moss and Miedema that he and Kelly lacked the power to do anything about Kleinjans and that they would raise the issue with MSUE leadership. (*Id.*) Moss testified that Kelly also said at the meeting that "it was completely fine [for Kleinjans] to be employed with MSU[E] while [he] was not an elected official and that if he became an elected official then that's where the problem would lie" because he could not be employed in both positions. (Moss Dep. 98–99, ECF No. 90-4.)

Later that day, Kelly emailed Shane about the meeting with Moss and Miedema. Kelly explained that "it is likely that the majority of commissioners would follow the lead of Joe Moss and only support the MSU Extension MOA if Christian [Kleinjans] is removed from Ottawa County." (12/7/2023 Email, ECF No. 97-7, PageID.1530.) Kelly indicated that the Board objected to, among other things, Kleinjans's "private account posts on Facebook groups" and "his part in leading the misinformation campaign that is creating the 'mutiny' experienced by the commissioners." (*Id.*, PageID.1530–1531.) Kelly noted that "if we do not act quickly our office space is at risk," and described this threat as "[a] nice parting jab from Joe [Moss]." (*Id.*, PageID.1531.)

On December 15, Moss emailed Kelly to, as Moss put it, help him "better understand the types of information [Kleinjans] was posting publicly on social media." (Moss Emails, ECF No. 90-8, PageID.1190.) Moss attached a social media post in which Kleinjans criticized the funding cuts to Ottawa Food. The email contained Moss's "thoughts/commentary" about the

"lies" in Kleinjans's post. (*Id.*)  After receiving no response, Moss sent another email on December 27.  Korpak emailed back the following day, explaining that he and Kelly would soon meet with Shane about the issue and would "report back to" Moss after the meeting.  (*Id.*, PageID.1189.) Moss responded and asked Korpak to "please review" a video of Kleinjans criticizing the Board's decision to terminate the County Health Administrator.  (*Id.*; Kelly Dep. 70.)  Korpak forwarded the email to Shane and Kelly and noted that "the meeting where [Shane]'s written response is shared with Chairman Moss, will also be the opportunity to provide Chairman Moss with more rationale to . . . ask the full board to approve the MOA."  (Moss Emails, PageID.1189.)  Kelly replied that he had watched the video and "thought it was excellent," noting that he had "no concerns with [Kleinjans] being in" the video.  (*Id.*, PageID.1188.)  Shane responded that "[t]he video is certainly nothing to be concerned about, especially since [Kleinjans] isn't even identified by name or any connection to the university."  (*Id.*)

On January 5, 2024, Kelly and Korpak met with Moss to tell him they would not limit Kleinjans's ability to campaign while he was an MSUE employee.  (Kelly Dep. 37.)  At the meeting, they gave a letter to Moss from Shane.  (*See id.*; *see also* 1/5/2024 Letter, ECF No. 95-21, PageID.1399.)  Shane explained in the letter that MSUE "had reservations about [Kleinjans]'s political activities" because the organization "is mandated to maintain a non-political stance," but he also "acknowledged [MSUE's] commitment to uphold [Kleinjan]'s rights to engage in politics as an American citizen."  (1/5/2024 Letter, PageID.1399.)  Shane stated that MSUE would not reassign Kleinjans, admitting that "the result does not align with [Moss's] initial request."  (*Id.*) He added that he "hope[d] that [Moss] [would] include the MOA in [the Board's] January 16, 2024, [meeting] Agenda."  (*Id.*)

8

A few days later, on January 8, Kelly sent an email to Moss explaining that he had been contacted by a local reporter who sought information about why the MOA had been delayed. (1/8/2024 Email, ECF No. 97-8, PageID.1534.)  Kelly wrote that the MOA delay was "becoming a more public issue," and said that the reporter had mentioned "the connection with Ottawa Food" and Kleinjans's "candidacy as the potential reason for the delay." (*Id.*)  Kelly told Moss that he "would love to be able to respond to that request saying that the contract is due to be on the upcoming agenda and that we do not anticipate any issues at this point." (*Id.*)  Moss replied and indicated that the MOA would be on the agenda at the next Board meeting. (*Id.*)  The Board unanimously approved the MOA on January 16, 2024.

Kleinjans won the recall election on May 7, 2024, and was sworn in as commissioner on May 15.  On May 23, Shane, Korpak, and Moore met with Kleinjans and informed him that he could not work as an MSUE employee while he was a commissioner. (PI Hr'g Tr. 44–45.)  Instead, they indicated that Kleinjans would have to take an unpaid leave of absence until the November 2024 election, and that if he won that election he would have to end his MSUE employment. (*Id.* at 45–46.)  Korpak explained to Kleinjans that he had been told by legal counsel that it would violate Michigan's Incompatible Offices Act, Mich. Comp. Laws §§ 15.181–85, for Kleinjans to serve both as an MSUE employee and an Ottawa County Commissioner. (*Id.* at 99.)  Korpak also testified that MSUE had concerns about "time constraint[s]" and about "what was allowed and wasn't allowed" by the MSUE Administrative Handbook. (*Id.*)  Kleinjans asked Shane if he could instead transfer to another county, but Shane indicated that "that wasn't possible because it would just further complicate and create more of a time . . . consumption for commissioner duties if [he] was traveling" into the county. (*Id.* at 46.)  Before the meeting, Korpak had also spoken to others at MSUE about potential alternative solutions that wouldn't require letting Kleinjans go.  He

suggested allowing Kleinjans to take a different job at MSU, but there were no openings available. (Korpak Dep. 115.)  At some point Shane and Jessica Nakfour—the MSUE Human Resources Director—indicated that Korpak's efforts were fruitless because given MSUE's "handbook" and "policies" and the Incompatible Offices Act, Kleinjans continuing to work there was "not an option."  (*Id.* at 116.)

After the May 23 meeting, Nakfour sent Kleinjans a letter reiterating the reasons for his termination.  The letter stated that "[u]nder Michigan's Incompatible Public Offices Act, one cannot hold two public positions at the same time.  Additionally, this arrangement is not permissible based on the Political Activities policy in the MSU Extension Administrative Handbook."  (5/23/2024 Nakfour Letter, ECF No. 95-11, PageID.1344.)  Korpak also sent a letter to Kleinjans with his notes from the meeting.  The notes similarly indicate that Kleinjans could not work at MSUE due to the Incompatible Public Offices Act and MSUE's Administrative Handbook.  (5/23/2024 Korpak Letter, ECF No. 95-10, PageID.1341.)  The notes state that "[t]he time commitment for the commissioner role was briefly discussed but deemed irrelevant due to the clear incompatibility of the two positions, as defined by state statute."  (*Id.*, PageID.1342.)  Korpak testified that "[p]reviously there had been the conversations about the time commitment, but in this meeting it felt like that . . . had kind of been determined already; and so the basis was going to be because of the incompatibility of the two positions."  (Korpak Dep. 108.)  Korpak clarified that the time issue "was a real problem and . . . it wouldn't be able to be resolved because there was a feeling that . . . [Kleinjans] wouldn't be able to do both positions."  (*Id.* at 109.)

Ultimately Kleinjans did not agree to go on unpaid leave, so MSUE terminated him.  (PI Hr'g Tr. 49.)  Kleinjans unsuccessfully appealed the termination decision through MSUE's internal grievance process.  (*See* Grievance Denial, ECF No. 95-29, PageID.1441.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the burden of demonstrating that there is no genuine dispute of material facts.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288–89 (1961)).  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

"This standard of review remains the same for reviewing cross-motions for summary judgment."  *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 411 (6th Cir. 2021).  "[A] case involving cross-motions for summary judgment requires 'evaluat[ing] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'"  *Id*. at 442 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)).

## III. ANALYSIS

Kleinjans brings a First Amendment retaliation claim against all Defendants.  As the Sixth Circuit has explained,

> First Amendment retaliation claims are analyzed under a burden-shifting framework. A plaintiff must first make a prima facie case of retaliation, which comprises the following elements: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is

a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Scarbrough v. Morgan Cnty. Bd. of Educ.,* 470 F.3d 250, 255 (6th Cir. 2006). If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate "by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Eckerman v. Tenn. Dep't of Safety,* 636 F.3d 202, 208 (6th Cir. 2010) (internal quotation marks omitted). "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.* Unlike in the *McDonnell Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims.

*Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 294–95 (6th Cir. 2012).

Before addressing the merits of Kleinjans's claim, it is worth mentioning an issue that Defendants do *not* raise—namely, whether it violates the First Amendment when a government entity terminates a public employee for speech that causes an outside actor to jeopardize the entity's funding.  Kleinjans does not argue that Defendants were motivated to terminate him by personal opposition to his protected activity, or even a general concern about the potential consequences of his political advocacy.  Rather, he contends that Defendants terminated him due to a specific fear that Moss would take away MSUE's funding.  While such a termination is indirectly *caused* by Kleinjans's protected activity, it is not obvious whether it is *motivated* by such activity.  Similarly, it is unclear whether terminating a government employee whose speech threatens an organization's funding would be unconstitutional under the *Pickering* balancing test, which allows an organization to terminate employees if their speech "interferes with the regular operation of the enterprise."  *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017) (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).  Of course, allowing an individual to extort the government into terminating an employee would arguably permit an unconstitutional "heckler's veto."  *See Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985) ("[T]hreatened disruption by others reacting to public employee speech simply may not be allowed to serve as justification for public

12

employer disciplinary action directed at that speech."); *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 748 (6th Cir. 2025) ("The government typically may not ban speech simply because the audience will respond with violence or threats or other unprivileged retaliatory conduct." (citation modified)); *Bennett v. Metro. Gov't of Nashville & Davidson County*, 977 F.3d 530, 554 (6th Cir. 2020) (Murphy, J., concurring) ("*Pickering* has been the law for decades, yet it remains unclear how much its balancing constit[tut]ionalizes a 'heckler's veto' for controversial expressions . . . ." (citation modified)). Ultimately, the Court need not resolve this issue here because the parties do not raise it and Defendants are entitled to summary judgment on an alternative basis.[3]

Turning to the merits, Defendants do not dispute that Kleinjans's political activity was protected by the First Amendment and that terminating him was an adverse action. Instead, they argue that he fails to establish a causal connection between his protected activity and his termination. Kleinjans contends that his public advocacy, his campaign, and (most of all) his election victory caused Defendants to terminate him because they were concerned that Moss would retaliate against MSUE for Kleinjans's political positions. Defendants argue that they instead terminated Kleinjans due to legitimate concerns about his ability to occupy both a Board seat and his MSUE position.

---

[3] The most relevant case of which the Court is aware is *DeLanis v. Metropolitan Government of Nashville & Davidson County*, 160 F.4th 732 (6th Cir. 2025), where the plaintiff alleged that a law firm had fired him because a city council member threatened to drop the firm as a client over the plaintiff's political views. The Sixth Circuit held that the law firm had not violated clearly established law because it "did not have clear notice that a law firm (or private company) violates the First Amendment by firing an employee when a government client threatens to take its business elsewhere if the employee continues to act adversely to the government." *Id.* at 744. Like the defendants in this case, the law firm, "for better or worse, sought to protect its client base, not to punish [the plaintiff] for his speech." *Id.* The Sixth Circuit "kn[e]w of no free speech case that covers this unusual setting, and [the plaintiff] [did] not identify one himself." *Id.* But the Sixth Circuit did not indicate how it would resolve the issue in a non-qualified immunity context, or clarify whether the analysis would differ between a private and public defendant.

It is unnecessary to determine whether Kleinjans has established a prima facie case because even assuming he has, Defendants have met their burden of establishing an alternate explanation for his termination.[4]  Defendants assert three reasons for Kleinjans's termination: serving in both positions would violate the Incompatible Offices Act; serving in both positions would be a conflict of interest as recognized by the MSUE Administrative Handbook; and serving in both positions would not be feasible given their respective time commitments.  As an initial matter, Kleinjans argues that Defendants cannot use the Incompatible Offices Act to justify his termination because Defendants asserted attorney-client privilege over their communications with MSUE counsel regarding this issue and have thus waived their right to rely on those communications as justification for their conduct.

In a prior order, this Court affirmed the magistrate judge's denial of Kleinjans's motion to compel production of Defendants' attorney-client communications regarding the Incompatible Offices Act.  (*See* 10/28/2025 Order, ECF No. 105.)  The Court found that Kleinjans was not entitled to the communications because Defendants represented that they would not assert an advice of counsel defense.  Since "[n]othing about [Defendants'] defense requires the[m] . . . to establish that they were in fact motivated by the advice of MSU attorneys to fire Kleinjans," the Court rejected Kleinjans's argument that Defendants were relying on privileged communications in their legal argument (while simultaneously shielding those communications from disclosure). (*Id.* at 6.)  Kleinjans now contends that Defendants are prohibited from arguing that they terminated him because MSUE counsel believed that holding both positions would violate state

---

[4] Although Defendants frame their arguments in terms of Kleinjans's failure to state a prima facie case, they focus primarily on alternative explanations, so the Court will construe their arguments as attempts to satisfy their burden of showing they would have terminated Kleinjans regardless of his protected conduct.

14

law.    Defendants argue that they may rely on the Incompatible Offices Act in explaining Kleinjans's termination as long as they do not specifically cite communications from counsel.[5]

The Court agrees that Defendants have waived their ability to rely on MSUE counsel's legal advice as to the Incompatible Offices Act.  But it is unnecessary to determine the precise scope of Defendants' waiver because even assuming that they cannot at all rely on state law, their other explanations—the conflict of interest and the time commitment—are sufficient to establish that Defendants would have taken the same adverse action in the absence of Kleinjans's protected conduct.  Kleinjans contends that Defendants also waived their conflict of interest argument by failing to disclose attorney-client communications.  But the argument that holding both positions would violate state law is different from the argument that holding both positions would be a conflict of interest.  Defendants' conflict of interest argument is predicated on the MSUE Administrative Handbook, so they may still make that argument notwithstanding their disclaimer of reliance on the Incompatible Offices Act.

It is true that Defendants were advised by counsel as to the application of the Administrative Handbook.  But Defendants' waiver of an advice of counsel defense occurred in the context of Kleinjans's motion to compel, which focused on "communications related to MSU's decision that a conflict of interest allegedly required, *as a legal conclusion*, termination of Plaintiff's employment with MSU Extension once he was elected to the Ottawa County Commission."  (Mot. to Compel 1, ECF No. 68 (emphasis added).)  This language naturally refers to the Incompatible Offices Act issue, not compliance with the Administrative Handbook.  Accordingly, the Court's order on the motion to compel specified that while Defendants waived

---

[5] As Kleinjans points out, it is difficult to see how Defendants could thread this needle given that their interpretation of the Incompatible Offices Act was apparently based entirely on the advice of counsel, not their own reading of the statute or case law.

15

reliance on their counsel's legal advice, they could still rely on alternative arguments such as "the conflict of interest in which Kleinjans would be enmeshed by serving both as an Ottawa County Commissioner and as an [MSUE] employee."  (10/28/2025 Order 6.)  Thus, Defendants are permitted to argue that they fired Kleinjans because they were concerned his dual positions would pose a conflict of interest.

Kleinjans views the advice of counsel issue as dispositive because he contends that Defendants have essentially waived their only available argument.  That is, because Defendants *in fact* terminated Kleinjans due to the advice of counsel, any other proffered reasons for his termination are necessarily false.  But this conclusion does not follow from Kleinjans's premises. Defendants' burden is to show "that the employment decision would have been the same absent the protected conduct."  *Dye*, 702 F.3d at 294.  Even if Defendants terminated Kleinjans because of legal advice, they may still argue that they *would have* terminated Kleinjans for alternative reasons.  Similarly, Kleinjans notes that Defendants stated in his termination letter that one of their alternative reasons for his termination—the time commitment of the commissioner role—was ultimately "deemed irrelevant due to the clear incompatibility of the two positions, as defined by state statute."  (5/23/2023 Korpak Letter, PageID.1342.)  Again, the fact that Defendants viewed it unnecessary to address the time commitment because the legal conflict was dispositive does not contradict their argument that, absent any legal issue, they would still have terminated Kleinjans due to the conflicting time commitments.

Viewing the record as a whole, Defendants' testimony and internal communications indicate that they were motivated to fire Kleinjans because of the conflict of interest created by his assumption of the commissioner position and the time commitment that position would require, rather than by Moss's threat or the political implications of Kleinjans's campaign.  When Kleinjans

16

first told Defendants he would be running for office, they indicated that holding a political role could create a conflict with his MSUE job.  While Kleinjans disputes whether Defendants specifically discussed in the December 2023 meeting what would happen to his MSUE employment if he became a commissioner, he does not dispute that they expressed concerns about the dual role; indeed, he testified that they talked to him about avoiding "ming[ling]" the campaign with his work.  (PI Hr'g Tr. 68.)  Thus, Defendants were concerned about political entanglements from the start.  One source of this concern was the Administrative Handbook, which recognizes that "[i]f an MSU Extension employee is elected to political office, the demands, expectations and prospective conflicting interests may be such that the employee will have to take an unpaid personal leave of absence during the term of office."   (Handbook Excerpt, PageID.1433.) Accordingly, when Kleinjans won the recall election, Defendants gave him the option of taking unpaid leave until November so that he could return to his MSUE position if he lost the election. In short, Defendants never tried to limit Kleinjans's political activity; they evinced concern only about the practical and ethical implications of holding both jobs.

Kleinjans does not present any evidence to contradict this explanation of his termination. Although there is no dispute that Moss and Miedema pressured Defendants to take action against Kleinjans for his political activity, there is also no dispute that Defendants categorically resisted that pressure.  Despite Moss's repeated complaints about Kleinjans, Defendants never told Moss they would comply with his requests.  To the contrary, Defendants explicitly told Moss they would not transfer Kleinjans and asserted that he had a right to free expression.  It is true that, in her November 2023 meeting with Kleinjans, Moore expressed concern about Moss's potential reaction to his candidacy.  But she also told him that MSUE would support his decision to run, and emphasized that the choice was his.

17

In sum, although there is substantial evidence that Moss attempted to exert pressure on Defendants, this evidence only supports the inference that Defendants had a *motive* to retaliate, not that they actually did so.  Kleinjans also points to Moss's testimony that Defendants told him Kleinjans would be unable to serve in both roles if he won the election.  But even if that statement was—as Kleinjans argues—an improper disclosure of internal personnel matters, Defendants' truthful statement to Moss that they would need to address the conflict between Kleinjans's two positions does not support an inference that they terminated Kleinjans to appease Moss.  Such an inference is also undermined by the fact that, in the same breath they mentioned Kleinjans's conflict, Defendants also told Moss that "it was completely fine [for Kleinjans] to be employed with MSU Extension" until he became a commissioner.  (Moss Dep. 98–99.)  It is hard to see how supporting Kleinjans until the election could be part of a strategy to curry Moss's favor.

The timing of events also supports Defendants' explanation for Kleinjans's termination.  If Defendants were inclined to cave to Moss's demands, they presumably would have done so when Moss was holding up the MOA and had significant leverage against them.  Instead, they consistently supported Kleinjans's right to make political statements and campaign against Ebel.  Moss eventually gave in after a reporter began asking questions, and there is no evidence that he subsequently exerted any pressure on Defendants.  It is implausible that Defendants would terminate Kleinjans in retaliation months later, long after Moss had given up the fight; it is equally implausible that they would allow Kleinjans to remain on leave until November (in case he lost the next election) if their motives were retaliatory.  Kleinjans argues that Defendants made up their mind to terminate him for his political activity in December 2023, when they initially learned of his candidacy.  But as noted above, it is difficult to see why this plan—supporting Kleinjans's right to campaign but terminating him if and when he took office—would be a plausible method of

18

appeasing Moss.  Rather, the timing is far more consistent with Defendants' assertion that they had no issue with Kleinjans's political activity and were only concerned about the conflicts inherent in the dual roles.

Kleinjans argues that Defendants' "shifting explanations" for his termination undermine the plausibility of their assertions.  (Pl.'s Resp. 23, ECF No. 108.)  He notes that "[i]nconsistency in an employer's explanation of the reasons for an adverse action raises an inference of pretext that must be drawn, at summary judgment, in favor of the nonmovant."  *Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 122 (6th Cir. 2007).  But there is nothing inconsistent or "shifting" about Defendants' explanations.  From the start, Defendants were clear that being a politician could create a conflict with being a government employee.  Kleinjans points out that in November 2023, Moore suggested he could serve as commissioner if he abstained from voting on MSUE funding.  But Moore also mentioned that being a commissioner would create a conflict of interest and that she did not see how he could have time to serve in both roles.  And it is entirely plausible that Moore initially thought holding both roles might be possible and only later concluded it was not.  Kleinjans also notes that, according to their version of events, Defendants initially mentioned time commitment concerns and the Administrative Handbook and only later brought up the Incompatible Offices Act.  But this fact does not show "inconsistency"; it merely indicates that Defendants at first had two concerns about Kleinjans's joint employment and, after legal counsel researched the issue, they developed a third concern.  These are not the kind of shifting explanations that support an inference of pretext.

Finally, Kleinjans contends that Defendants' concerns about a conflict of interest or a time conflict did not reasonably justify his termination.  As to the conflict of interest, Kleinjans argues that the proper response would have been requiring him to abstain from voting on certain issues

on the Board.  But Kleinjans cites no legal authority for the proposition that a government employer can only address conflicts of interest through abstention instead of termination.  As to the time conflict, Kleinjans contends that the problem was illusory because the commissioner position is part-time, the Board regularly meets during business hours only once a month, and he had over two months of vacation time that he could have used to attend the Commission meetings. (Pl.'s Resp. 13 n.2.)  However, according to Kleinjans's own testimony, the once-a-month figure omits subcommittee meetings, which also occur during business hours.  (PI Hr'g Tr. 75–76.) Moreover, being a commissioner presumably involves significant work outside of meetings. Finally, even if Kleinjans could establish that working in both positions was feasible, that does not necessarily contradict Defendants' assertion that they *believed* there would be a time conflict and viewed that as a sufficient reason to terminate him.  The First Amendment prohibits retaliation based on protected conduct; it does not require every personnel decision to be unassailably logical.

## IV. CONCLUSION

Defendants are entitled to summary judgment because they have established that they would have terminated Kleinjans regardless of his protected activity, and no reasonable jury could find otherwise based on the record before the Court.  An order and judgment will enter in accordance with this Opinion.

Dated: March 16, 2026

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE